CBS INC., Fox Broadcasting Co., et al., Plaintiffs-Appellees,

v.

PRIMETIME 24 JOINT VENTURE, Defendant-Appellant.

Nos. 98-4945, 98-5082, 98-5582, 99-10177, 99-14039, 99-14040 and 00-10386.

United States Court of Appeals,

Eleventh Circuit.

March 26, 2001.

Appeals from the United States District Court for the Southern District of Florida. (No. 96-03650-CV-LCN), Lenore C. Nesbitt, Judge.

Before ANDERSON, Chief Judge, and CARNES and OAKES[*], Circuit Judges.

CARNES, Circuit Judge:

This copyright infringement action was brought against PrimeTime 24 Joint Venture ("PrimeTime"), a satellite television carrier, by four major television networks, four associations representing the networks' local affiliates, and four corporations owning affiliates. After the plaintiffs proved at trial that PrimeTime had unlawfully distributed copyrighted network programming to satellite dish subscribers who were not authorized to receive such programming by virtue of the statutory, compulsory license under which PrimeTime was operating, the district court entered a permanent injunction against PrimeTime requiring it to terminate the transmission of such programming to unauthorized subscribers.

Thereafter, Congress passed the Satellite Home Viewer Improvement Act of 1999 ("Improvement Act"), Pub.L. No. 106-113, § 1001, *et seq.,* 113 Stat. 1537, 515 (1999) which contained a "grandfather" clause permitting PrimeTime and other satellite carriers to continue transmitting network broadcasting to satellite dish owners who had received a particular type of transmissions before "any termination" of such transmissions occurring prior to October 31, 1999. *Id.* § 1005(a)(2)(B)(iii). Because of this clause, which was codified as 17 U.S.C. § 119(a)(2)(B)(iii), the district court entered an order modifying the permanent injunction. PrimeTime brought this appeal because it contends that the modifications to the injunction did not go far enough.

The specific issue this appeal presents is whether the Improvement Act's "any termination" language includes voluntary as well as involuntary terminations of transmissions. The more general and fundamentally

---

[*]Honorable James L. Oakes, U.S. Circuit Judge for the Second Circuit, sitting by designation.

important issue is whether the plain meaning of statutory language trumps contrary legislative history. We answer both questions in the affirmative. As a result, we vacate the district court's December 16, 1999 order modifying the injunction against PrimeTime and remand for further modification of the injunction.

## I. BACKGROUND

The plaintiffs in this case are four television networks (CBS Broadcasting, Inc.; Fox Broadcasting Co.; ABC, Inc.; and the National Broadcasting Company), four trade associations comprised of stations affiliated with the networks, and four corporations which own local broadcast stations affiliated with CBS. (We will refer to the plaintiffs collectively, as "the Networks.") PrimeTime is a satellite television carrier which transmits programming to subscribers who own or rent satellite dishes. As a result of the Satellite Home Viewer Act ("SHVA"), 17 U.S.C. § 119, PrimeTime received a compulsory, statutory copyright license to transmit network programming to viewers who are "unserved" by over-the-air network broadcasters. The SHVA defined the meaning of "unserved households" by reference to an objective level (Grade B) of signal intensity.

The Networks brought this action against PrimeTime in 1996, asserting that it had infringed the Networks' copyrights by transmitting network material to individuals who did not fit within the SHVA's definition of "unserved." They alleged that PrimeTime had improperly relied on individual subscribers' subjective representations concerning their picture quality and signed up large numbers of subscribers who were not eligible to receive network programming from a satellite carrier. In March 1997, the Networks moved for a preliminary injunction, and after finding that PrimeTime had ignored the objective standard set out in the statute for determining unserved households, the district court entered a preliminary injunction against it in July 1998. That injunction prohibited PrimeTime from signing up any new "illegal" customers and ordered it to terminate transmissions to existing illegal customers within 90 days. Thereafter, the parties agreed to a number of extensions of the deadline for terminating illegal subscribers, and those extensions were embodied in court orders modifying the preliminary injunction.

In December 1998, following a full trial, the district court issued a final judgment and permanent injunction in favor of the Networks. The permanent injunction required that the transmission of network broadcasting to illegal subscribers signed up during the pendency of the motion for an injunction to be terminated by February 28, 1999, and that the transmission to subscribers signed up before the motion was filed to be terminated by April 30, 1999. PrimeTime carried out the February 1999 terminations. Before the next deadline, however, the parties agreed to postpone the remaining terminations until June 30 and

December 31, 1999.

The statutory license provided by the SHVA was scheduled to expire at the end of 1999. Throughout that year Congress considered an extension of, and changes to, the statutory license. After both houses of Congress passed differing bills amending the SHVA, a conference committee negotiated what became the Improvement Act. Congress passed the Improvement Act in November 1999, and the President signed the bill into law on November 29, 1999.

One of the provisions of the Improvement Act "grandfathered" in the transmission of network broadcasting by satellite carriers to C-band subscribers,[1] even if those subscribers did not fit within the statutory license's definition of "unserved households." Improvement Act § 1005(a)(2)(B)(iii), 113 Stat. 1537, 520 (codified at 17 U.S.C. § 119(a)(2)(B)(iii)). This provision, which is the subject of this appeal, states that:

> The limitations of clause [17 U.S.C. § 119(a)(2)(B)(i), which limits the compulsory license to "unserved households" as defined by the statute,] shall not apply to any secondary transmissions by C-band services of network stations that a subscriber to C-band service received before *any termination* of such secondary transmissions before October 31, 1999.

*Id.* (emphasis added). Congress also provided that C-band subscribers who were receiving network broadcasting as of October 31, 1999 could continue to receive such broadcasting.

In light of the grandfather clause, PrimeTime moved the district court to modify the permanent injunction in order to permit PrimeTime to transmit network broadcasting to C-band subscribers falling within the scope of the clause. PrimeTime argued that in light of the grandfather clause, it should be permitted to transmit network broadcasting to any C-band dish owner whose service had previously been terminated, regardless of whether the service had been terminated voluntarily (service was canceled at the subscriber's request or as a result of the subscriber's failure to pay) or involuntarily (service was canceled pursuant to court order or as a result of a network's challenge to the eligibility of a subscriber). In support of its position PrimeTime focused on the fact that the grandfather clause refers to "any termination."

The Networks countered by arguing that the grandfather clause was only intended to permit transmission to C-band subscribers whose service had been terminated involuntarily, either as a result of court orders or as a result of previous challenges to eligibility. They argued that the phrase "any termination" in

---

[1]C-band refers to older, outmoded satellite equipment (which use 5-foot, rotating dishes). The newer technology is referred to as "DBS." At the time this action was brought, PrimeTime transmitted to DBS and to C-band subscribers, but by November 1999, it only transmitted network broadcasting to C-band customers. This appeal involves only transmissions to C-band customers by satellite television carriers.

the grandfather provision was intended to refer to, and was "shorthand" for, the transmission cutoffs prompted by the district court's injunction. In support of their argument, the Networks quoted several statements from members of Congress, from the district court, and from others in which the word termination was used in reference to the court-ordered cutoffs. The Networks noted that the statute was passed in the context of a so-called "cutoff crisis" resulting from the public backlash (partly as a result of PrimeTime's efforts) against the court-ordered terminations. The Networks relied heavily on the Conference Report's description of this section of the Improvement Act which stated that:

> Section 1005(a)(2) of this Act creates a new section 119(a)(2)(B)(iii) of the Copyright Act to permit continued delivery by means of C-band transmissions of network stations to C-band owners who received signals of the pertinent network on October 31, 1999, or were recently required to have such service terminated pursuant to court orders or settlements under section 119.

Conference Report to the Improvement Act, 145 Congressional. Rec. H11792, H11794 (daily ed. Nov. 9, 1999).

After considering the parties' arguments concerning the scope of the grandfather clause, the district court noted that:

> Now, I've read and reread this statute and I don't think I understand it too well insofar as it's written. It's not a model of clarity. However, I have received some comfort from reading the conference report, which I think is clearer.

The court then stated that "[t]he statute could have said very easily any subscriber who received network programming at any time, and they didn't say it." The court held that the § 1005(a)(2)(B)(iii) grandfather clause was only applicable to those subscribers whose service had been involuntarily terminated as a result of court orders. Consequently, the court amended its permanent injunction to state that:

> PrimeTime 24 shall not be prohibited by this Order from delivering, through C-band services, any network station ... to:
>
> (a) a C-band dish at a household that received any ABC, CBS, Fox, or NBC station ... from PrimeTime 24 by C-band services as of October 30, 1999, or
>
> (b) a C-band dish at a household that received any ABC, CBS, Fox, or NBC station ... from PrimeTime 24 by C-band services before October 31, 1999 and who had such service terminated pursuant to court order.

PrimeTime appealed, challenging the district court's interpretation of § 1005(a)(2)(B)(iii) of the Improvement Act.

## II. DISCUSSION

The sole issue before us is whether the § 1005(a)(2)(B)(iii) grandfather provision of the Improvement Act extends to all C-band satellite subscribers whose service was terminated before October 31, 1999, or only

to those whose service was involuntarily terminated.

## A. THE PLAIN MEANING OF THE STATUTE

This Court has repeatedly stated that "[w]e begin our construction of [a statutory provision] where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision." *Harris v. Garner,* 216 F.3d 970, 972 (11th Cir.2000) (en banc). We have also said just as frequently that "[w]hen the import of words Congress has used is clear ... we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language." *Id.* at 976. In other words, "[w]hen the words of a statute are unambiguous, then, this first canon [of statutory construction] is also the last: judicial inquiry is complete." *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1186 (11th Cir.1997) (citation omitted). The rule is that "we must presume that Congress said what it meant and meant what it said." *United States v. Steele,* 147 F.3d 1316, 1318 (11th Cir.1998) (en banc) (citing *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992)).

The Supreme Court has similarly stated that "[g]iven [a] straightforward statutory command, there is no reason to resort to legislative history." *United States v. Gonzales,* 520 U.S. 1, 6, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997); *accord, Circuit City Stores, Inc. v. Adams,* --- U.S. ----, --- S.Ct. ----, ----, --- L.Ed.2d ---- (2001) ("As the conclusion we reach today is directed by the text of § 1, we need not assess the legislative history of the ... provision."). Even where "[t]here are ... contrary indications in the statute's legislative history ... we do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States,* 510 U.S. 135, 147, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994). "We do not start from the premise that [the statutory] language is imprecise. Instead, we assume that in drafting legislation, Congress said what it meant." *United States v. LaBonte,* 520 U.S. 751, 757, 117 S.Ct. 1673, 1677, 137 L.Ed.2d 1001 (1997). Likewise, we assume the Supreme Court, in saying that, said what it meant.

Our first task in deciding this case, then, is to determine whether the plain meaning of the Improvement Act's § 1005(a)(2)(B)(iii) grandfather clause, and in particular its phrase "any termination," is apparent. "In the absence of a statutory definition of a term, we look to the common usage of words for their meaning." *Consolidated Bank, N.A. v. United States Dep't of Treasury,* 118 F.3d 1461, 1464 (11th Cir.1997). *See also In re Griffith,* 206 F.3d 1389, 1393 (11th Cir.2000) (en banc) ("In interpreting the language of a statute, we generally give the words used their ordinary meaning.") (citations and quotations omitted).

In order to determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance. *See, e.g., Gonzales,* 520 U.S. at 5, 117 S.Ct. at 1035; *Harris,* 216 F.3d at 973. Employing this approach confirms our common sense impression that the ordinary meaning of the phrase "any termination" is plain and apparent. The word "termination" is defined as follows:

> 1. The act of terminating or the condition of being terminated. 2.a. The end of something in time; the conclusion. b. An end of something in space; a limit or an edge. 3. A result; an outcome.

*American Heritage College Dictionary* 1399 (3d ed.1993). The word "terminate" has the following definition:

> 1. To bring to an end or a halt. 2. To occur at or form the end of; conclude. 3. To discontinue the employment of; dismiss.—*intr.* 1. To come to an end. 2. To have as an end or a result.

*Id.* There is no ambiguity in the word "termination." The ordinary meaning of that word includes voluntary terminations as plainly as it does involuntary terminations. The Networks do not dispute that, and admit in their brief that their interpretation of the statute is contrary to the "literal application of the statute according to the dictionary terms." The fact that the Networks have to write into the statutory phrase the limiting adjective "involuntary" in order to express what they think Congress intended is further proof that the plain meaning of what Congress actually said is against their position. What Congress actually did, of course, is choose an expansive modifier—the word "any"—instead of a restrictive one.

Both the Supreme Court and this Court have had occasion to consider the meaning of the word "any." In *Gonzales,* the Supreme Court noted that "[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.' " 520 U.S. at 5, 117 S.Ct. at 1035 (quoting *Webster's Third New Int'l. Dictionary* 97 (1976)). The Court noted that in the absence of "any language limiting the breadth of that word," it must be read as referring to all of the subject that it is describing. *Id.*

Similarly, this Court has held that "the adjective 'any' is not ambiguous; it has a well-established meaning." *Merritt,* 120 F.3d at 1186. *See also Lyes,* 166 F.3d at 1337 (same). As we have said before, because " 'Congress did not add any language limiting the breadth of that word,' ... 'any' means all." *Merritt,* 120 F.3d at 1186 (quoting *Gonzales,* 520 U.S. at 5, 117 S.Ct. at 1035). *See also Lyes v. City of Riviera Beach,* 166 F.3d 1332 (11th Cir.1999) (en banc) (same); *United States v. Castro,* 837 F.2d 441, 445 (11th Cir.1988) (concluding that "any" meant "every" or "all"). "This long history of established meaning is important, because we readily presume that Congress knows the settled legal definition of the words it uses, and uses them in the settled sense." *Harris,* 216 F.3d at 974. It is beyond reasonable dispute that if plain

meaning and common usage are the guide, as they should be, the phrase "any termination" in the Improvement Act's § 1005(a)(2)(B)(iii) grandfather clause means all terminations of any kind, not just involuntary terminations such as those resulting from court orders.

The Networks dress up another kind of argument in "plain meaning" clothes by urging us to view the text of the statute against the backdrop of the "cutoff crisis," and say that if we do so we will see that the legislators used the word "termination" as shorthand for involuntary cutoffs.[2] It follows, they contend, that the "plain meaning" of the phrase actually supports their position that "any termination" does not really mean any termination but only involuntary terminations. But the plain meaning clothes do not fit that argument. It is not a plain meaning argument, but instead an argument that we should depart from the plain meaning of the words Congress chose in favor of what we might divine from the surrounding circumstances that it really meant.[3]

---

[2]According to the Networks, PrimeTime and its allies engaged in a campaign to stir up a public outcry against the district court's injunction requiring termination of the illegal transmission of network broadcasting. It was the resulting public reaction, the Networks claim, which brought the issue of the termination of network programming by satellite carriers to the attention of Congress and resulted in the Improvement Act's grandfather provision which is the subject of this appeal. It follows, the Networks say, that the meaning of the grandfather clause can best be understood against that background, which, they say, was one of protest against involuntary terminations.

Although we decline the invitation to consider the legislative history of the Improvement Act, we pause to point out that while it seems likely that Congress was concerned with, and perhaps even primarily concerned with, the termination of network broadcasting resulting from court orders when it included the § 1005(a)(2)(B)(iii) grandfather clause in the Improvement Act, none of the legislative history pointed out by the Networks establishes that concern was the exclusive purpose for the provision. Where there exists "straightforward language ... [w]e cannot read the lack of specific legislative history confirming one possible application of a single provision in an enormous statutory structure to signify Congressional intent to exclude such an application." *Blue Cross and Blue Shield of Alabama v. Weitz,* 913 F.2d 1544, 1549 (11th Cir.1990). The reason is that "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Lyes,* 166 F.3d at 1338 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998)).

[3]The Supreme Court has recently reminded us that perceptions about the circumstances giving rise to legislation, or about private interest groups' roles in lobbying for or against legislation, provide a dubious basis from which to infer legislative intent. As the Court explained:

Legislative history is problematic even when the attempt is to draw inferences from the intent of duly appointed committees of the Congress. It becomes far more so when we consult sources still more steps removed from the full Congress and speculate upon the significance of the fact that a certain interest group sponsored or opposed particular legislation.... We ought not attribute to Congress an official purpose based on the motives of a particular group that lobbied for or against a certain proposal—even assuming the precise intent of the group can be determined, a point doubtful both as a general rule and in the instant case. It is for the Congress, not the courts, to consult political forces and then decide how best to resolve conflicts in the course of writing the

The "plain" in "plain meaning" means that we look to the actual language used in a statute, not to the circumstances that gave rise to that language. Our decisions back that up, requiring that ambiguity in statutory language be shown *before* a court delves into legislative history. *See, e.g., Harris,* 216 F.3d at 976 ("When the import of the words Congress has used is clear, as it is here, we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language."); *United States v. Veal,* 153 F.3d 1233, 1245 (11th Cir.1998) ("Review of legislative history is unnecessary unless a statute is inescapably ambiguous." (citation and quotation omitted)). The Supreme Court's decisions establish the same thing. *See Circuit City,* --- S.Ct. at ---- (where the meaning of a provision can be drawn from the text of a statute, there is no need to assess the legislative history of the provision); *Gonzales,* 520 U.S. at 6, 117 S.Ct. at 1035 (same); *Ratzlaf,* 510 U.S. at 147-48, 114 S.Ct. at 662 ("There are, we recognize, contrary indications in the statute's legislative history. But we do not resort to legislative history to cloud a statutory text that is clear."). Any ambiguity in the statutory language must result from the common usage of that language, not from the parties' dueling characterizations of what Congress "really meant." Where the clear and unambiguous language of a statute provides a bridge to Congress' intent, we need not and will not wade into the brackish waters of legislative history.[4]

Even where the statutory language is not entirely transparent, which we believe the provision at issue in this case is, the Court has tools at its disposal for elucidating the meaning of a statute without reverting to legislative history. These tools are the canons of construction. The canons of construction are "interpretative tools, ... which 'are no more than rules of thumb that help courts determine the meaning of legislation.' " *Griffith,* 206 F.3d at 1393 (citation omitted). The canons assist the Court in determining the meaning of a particular statutory provision by focusing on the broader, statutory context. *See, e.g., DBB,* 180 F.3d at 1281 (noting that canons allow courts to avoid "look[ing] at one word or term in isolation, but instead [allows us

---

objective embodiments of law we know as statutes.

*Circuit City,* --- S.Ct. at ---- (citations omitted). We are not persuaded by the Networks' arguments based upon the events leading to the enactment of the grandfather provision or PrimeTime's role in lobbying for that provision.

[4]Our decision in *United States v. DBB, Inc.,* 180 F.3d 1277, 1281-82 (11th Cir.1999), which the Networks rely upon, is not to the contrary. There we found the term "restraining order" to be ambiguous only after noting that, consistent with common usage and dictionary definitions, the phrase could refer either to a temporary restraining order or, more generally, to other forms of injunctive relief. *Id.* at 1282. The finding of ambiguity in *DBB* was in no way based upon legislative history, but instead arose from the common usage of the term.

to] look to the entire statutory context").

One benefit of applying canons of construction, rather than considering legislative history, is that their application does not require resort to extrinsic material. Instead, the canons of construction focus on the text actually approved by Congress and made a part of our country's laws. As the Supreme Court's recent opinion in *Circuit City* confirms, where the meaning of a statute is discernible in light of canons of construction, we should not resort to legislative history or other extrinsic evidence.[5] Canons of construction are essentially tools which help us to determine whether the meaning of a statutory provision is sufficiently plain, in light of the text of the statute as a whole, to avoid the need to consider extrinsic evidence of Congress' intent.[6]

Application of canons of construction bolster our conclusion in this case that the phrase "any termination" is not limited to involuntary terminations resulting from court orders. One canon recognized by the Supreme Court is that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (citation and quotations omitted). Also, "[w]here Congress knows how to say something but chooses not to, its silence is controlling." *Griffith,* 206 F.3d at 1394 (citation and quotations omitted, alteration in original). In addition, "[a] term appearing in several places in a statutory text is generally read the same way each time it appears." *Ratzlaf,* 510 U.S. at 143, 114 S.Ct. at 660 (citation omitted).

Application of these canons further convinces us of the same conclusion dictated by the plain meaning of the statutory phrase "any termination." We find significant Congress' use of the word "terminated" elsewhere in a similar provision in the same Act. In § 1005(c) of the Improvement Act, which is a separate grandfather provision, Congress provided for the transmission of network broadcasting to certain subscribers who "had satellite service ... terminated after July 11, 1998, and before October 31, 1999, *as*

---

[5]In *Circuit City,* the Court applied the canons of construction to a provision of the Federal Arbitration Act. --- S.Ct. at ----. After ascertaining the meaning of the provision through use of the canons, the Court stated that there was no need to consider the legislative history of the provision. *Id.*

[6]On occasion, this Court has referred to the plain meaning rule itself as a one of the canons of construction. *See, e.g., Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1185-86 (11th Cir.1997). While this may be true, we believe that the clear language of a statutory provision holds a status above that of any other canon of construction, and often vitiates the need to consider any of the other canons. Therefore, if the plain meaning rule is a canon of construction, it is the largest caliber canon of them all.

*required by this section. ...*" Improvement Act § 1005(c), 113 Stat. 1537, 521 (emphasis added). This provision apparently allows both C-band and DBS subscribers to receive network broadcasting from satellite carriers until December 31, 2004 if they do not receive an over-the-air network signal of Grade A intensity, which is a clearer signal than the Grade B intensity used in the definition of "unserved households." By including the phrase "as required by this section" in the § 1005(c) grandfather clause, Congress modified the word "termination" in that provision so that it refers only to terminations required by the section of the SHVA governing the compulsory license, 17 U.S.C. § 119.

So, Congress chose to modify and limit the word "termination" in another grandfather clause in the same statute but not in the grandfather clause at issue in this case. As we have explained before, "Congress' clear ability to modify [a] term ... to indicate the type thereof in other instances ..., and the fact that it did not do so in the disputed phrase, indicates that it had no intention to so limit the term." *Consolidated Bank,* 118 F.3d at 1465. *See also Gonzales,* 520 U.S. at 5, 117 S.Ct. at 1035 (finding significant that the word "any" was modified in one portion of the statute, but not in another); *Russello,* 464 U.S. at 23, 104 S.Ct. at 300 (same). Therefore, the canons of construction support our conclusion that the meaning of the Improvement Act's § 1005(a)(2)(B)(iii) grandfather clause is clear and unambiguous. Because the plain meaning of the phrase "any termination" is settled and clear—both on its face and in light of the canons of construction—the Networks may only prevail if they show that an exception to the plain meaning rule applies. We turn now to that question.

## B. POSSIBLE EXCEPTIONS TO THE PLAIN MEANING RULE

The Networks argue that even if we conclude that the plain meaning of the term "any termination" includes voluntary ones—which we do—they should prevail nonetheless. The Networks point to language from several of our cases which indicates that we may "look beyond the plain language of a statute at extrinsic evidence" if:

> (1) the statute's language is ambiguous; (2) applying it according to its plain meaning would lead to an absurd result; or (3) there is clear evidence of contrary legislative intent.

*DBB,* 180 F.3d at 1281. The Networks argue that each of these circumstances is present in this case.

### 1. *Ambiguity*

The first of the supposed exceptions mentioned in the quotation from *DBB* is really just a restatement of the plainness requirement of the plain meaning rule. If the statutory language is ambiguous, its meaning is not plain. Stating that ambiguity is an exception, instead of part of the predicate for the rule, merely

confuses things.

## 2. *Contrary Legislative Intent*

As for the third listed exception in the quote from *DBB,* it is merely dicta in that case, and it is also contrary to the law of this Circuit. The statement in *DBB* that clear evidence of legislative intent can control over the plain meaning of legislative language is merely dicta, because the statutory language in that case was found to be ambiguous, 180 F.3d at 1282, so the plain meaning rule did not apply there for that reason. Even if that statement had been a holding of *DBB,* it would not bind us, because there is binding precedent of both this Court and the Supreme Court to the contrary.

Our en banc opinion in *Harris,* which the *DBB* panel was powerless to overrule, does *not* say that if the meaning of a legislative provision is plain from the language, we will still consider contrary legislative history provided that it is really clear legislative history. Such an exception would have serious rule-swallowing potential because it would require that legislative history always be considered in order to determine whether there was "clear evidence of contrary legislative intent." *DBB,* 180 F.3d at 1281. Instead, the en banc Court meant it when it said in *Harris* that:

> When the import of the words Congress has used is clear, as it is here, we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language.

*Harris,* 216 F.3d at 976. The *Merritt* panel, whose decision binds subsequent panels including the one in *DBB,* also meant what it said: "When the words of a statute are unambiguous, then, this first canon ... is also the last: judicial inquiry is complete." *Merritt,* 120 F.3d at 1186 (quotation omitted). Likewise, we have every reason to believe that the Supreme Court also meant what it said: "Given [a] straightforward statutory command, there is no reason to resort to legislative history," *Gonzales,* 520 U.S. at 6, 117 S.Ct. at 1035, and "we do not resort to legislative history to cloud a statutory text that is clear," *Ratzlaf,* 510 U.S. at 147-48, 114 S.Ct. at 662.

The reasons for refusing to give even clear legislative history more weight than clear statutory language are sound. This Court has explained that "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Lyes,* 166 F.3d at 1338 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998)). When a statute is passed by Congress, it is the text of the statute, and not statements put in some committee report or made on the floor—and certainly not someone's understanding of the circumstances which gave rise to the

legislation—that has been voted on and approved by the people's elected representatives for inclusion in our country's laws. The language of our laws is the law.

Moreover, as Judge Harold Leventhal once observed, the use of legislative history is akin to "entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff,* 507 U.S. 511, 519, 113 S.Ct. 1562, 1567, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring). This problem of subjectivity and indeterminacy may be avoided (or at least minimized) by focusing not on legislative history, but instead on the text of a statute, which is "the result of innumerable compromises between competing interests reflecting many competing purposes and goals.' " *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.,* 51 F.3d 235, 238 (11th Cir.1995). The statutory language itself is the principal battlefield where the warring interests struggle against each other, and it is to that battlefield we should look for the results of the battle.

Another reason for adhering to the clear language Congress chose instead of some other indicia of its intent is the absence of a convincing explanation for the divergence of the two. For example, in this case, if Congress really meant in § 1005(a)(2)(B)(iii) of the Improvement Act to grandfather only involuntary terminations resulting from court orders, then why did it say "any termination"? Why not simply say "any involuntary termination" or "any termination resulting from court orders"? It could easily have done so, but did not. Those who ask courts to give effect to perceived legislative intent by interpreting statutory language contrary to its plain and unambiguous meaning are in effect asking courts to alter that language, and "[c]ourts have no authority to alter statutory language.... We cannot add to the terms of [the] provision what Congress left out." *Merritt,* 120 F.3d at 1187. "The language of the statute is entirely clear; and if that is not what Congress meant then Congress has made a mistake and Congress will have to correct it." *Conroy,* 507 U.S. at 528, 113 S.Ct. at 1572 (Scalia, J., concurring).

### 3. *Absurdity*

The quote from *DBB* that we set out earlier in this opinion does list one recognized exception to the plain meaning rule—absurdity of results. We have recognized that courts may reach results inconsistent with the plain meaning of a statute "if giving the words of a statute their plain and ordinary meaning produces a result that is not just unwise but is clearly absurd." *Merritt,* 120 F.3d at 1188. However, we have also observed that:

> Though venerable, the principle is rarely applied, because the result produced by the plain meaning canon must be truly absurd before the principle trumps it. Otherwise, clearly expressed legislative decisions would be subject to the policy predilections of judges.

*Id.* In other words, it is irrelevant that "[w]e may not have made the same policy decision had the matter been ours to decide [if] we cannot say that it is absurd, ridiculous, or ludicrous for Congress to have decided the matter in the way the plain meaning of the statutory language indicates it did." *Id.*

The Networks argue that absurd results would follow from the plain meaning interpretation of the Improvement Act's § 1005(a)(2)(B)(iii) grandfather clause because it would permit transmission to "any C-band dish owner who formerly received network transmissions—no matter how far in the past." They also attempt to show absurdity by way of the example of a "C-band dish owner one mile away from the local Fox station in Atlanta who subscribed to a distant Fox station for one month in 1989 and then canceled her subscription for lack of interest," or of a subscriber who received transmission because of a computer error or whose service was canceled because of failure to pay bills.

In light of this Court's exacting standard for finding absurdity, we do not believe that the Networks have shown that the plain meaning interpretation of the Improvement Act's grandfather clause would lead to truly absurd results. In particular, it seems to us that equally "absurd" results are possible under the Networks' own interpretation of the statute. Nothing in their interpretation would prevent a subscriber who lived one mile from a local affiliate from receiving transmission as long as the subscriber was terminated pursuant to a court order. Yet, everyone, including the Networks, agrees Congress certainly intended to bring about results which include that one. Nor are we convinced that permitting subscribers to be grandfathered in even though considerable time may have passed since they last received transmission is an absurd result. Interests such as fostering competition between satellite and cable carriers, or protecting rural consumers who invested in outmoded equipment—two objectives which have some support in the Improvement Act's legislative history—could be served by such results.[7]

We should always remember when a party argues the absurd results exception that Congress often legislates at the macro level, not on a micro scale. General problems are given general solutions; and even where more specific solutions are possible, compromises are often struck. The language used may sweep too broadly in some respects affording protection and relief to some who are not truly deserving or aggrieved, and too narrowly in other respects failing to reach some who are more deserving or aggrieved. But that is

---

[7]"Notwithstanding that well-recognized and bedrock principle [of not advancing to legislative history when statutory text is clear], sometimes judges who find that legislative history supports and complements the plain meaning of statutory language cannot resist the temptation to set out that history. We have given in to that temptation more than once." *Harris,* 216 F.3d at 977.

the nature of a political process and of all worldly endeavors. Imperfection is not absurdity, but is inherent in humankind and all of our works. The Networks have not shown that the plain language interpretation of the grandfather clause will cause the type of truly absurd or ludicrous results which would permit us to depart from the plain meaning of the statute.

## C. THE NETWORKS' NARROW CONSTRUCTION ARGUMENT

Finally, we address the Networks' argument that the Court should not interpret the Improvement Act's § 1005(a)(2)(B)(iii) grandfather provision according to the plain meaning of its words because doing so would expand a compulsory copyright license. The Networks point to an opinion from our predecessor court which stated that:

> We begin by noting that the compulsory license provision is a limited exception to the copyright holder's exclusive right to decide who shall make use of his composition. As such, it must be construed narrowly, lest the exception destroy, rather than prove, the rule. Thus we should neither expand the scope of the compulsory license provision beyond what Congress intended in 1909, nor interpret it in such a way as to frustrate that purpose.

*Fame Publ'g. Co. v. Ala. Custom Tape, Inc.,* 507 F.2d 667, 670 (5th Cir.1975). But the *Fame* opinion nonetheless recognized that Congress' intent is controlling. *Id.* While the narrow construction rule makes good sense when the provision relating to compulsory licenses is ambiguous, it does not require that the legislative intent embodied in the plain meaning of statutory language be jettisoned in favor of that or any other rule of construction. Any such requirement would be inconsistent with this Court's more recent binding precedent which emphasizes the primacy of statutory language. *See, e.g., Harris,* 216 F.3d at 976. Whatever guidance the quoted part of the *Fame* opinion might offer in general, it cannot require that we interpret a specific statutory provision, which was enacted a quarter of a century later, in a way that is contrary to the clearly expressed plain meaning of the provision.

The Networks also point out, in support of their narrow construction argument, that the conference committee report to the Improvement Act stated that the committee was aware "it [was] acting in derogation of the exclusive property rights granted by the Copyright Act to copyright holders, and that it therefore need[ed] to act as narrowly as possible to minimize the effects of the government's intrusion on the broader market...." 145 Congressional. Rec. H11769, H11792 (1999). But as we have already explained, even clear evidence of contrary intent in legislative history materials cannot override the plain meaning of unambiguous statutory language. Besides, it is not altogether clear that the conference committee report would require a different result, even if it were controlling. It is one thing to construe a provision narrowly and another to

construe it contrary to its plain meaning and unambiguous terms.

### III. CONCLUSION

The phrase "any termination" in 17 U.S.C. § 119(a)(2)(B)(iii), means "any termination" prior to the specified date, and that includes both voluntary and involuntary terminations. Accordingly, the district court's December 16, 1999 order modifying the permanent injunction in this action is VACATED, and this case is REMANDED to the district court for further proceedings consistent with this opinion.

OAKES, Circuit Judge, concurring:

I heartily concur in the conclusion of Judge Carnes's opinion, though I come to it by a somewhat different route. I, by no means, intend to diminish either his interpretation of the Eleventh Circuit precedents, supported by what some of the Justices on the Supreme Court have said from time to time, or his ultimate definition of the terms "any" and "termination" as including voluntary as well as involuntary terminations in the context in which they appear. But I would add that the legislative purpose of Satellite Home Viewer Improvement Act ("SHVIA") provides an alternative basis for the result in this case.

While I have serious reservations about using legislative history to support judicial reasoning, especially because so much of the "history" in recent years has been manufactured to suit the purposes of Congress, I start with Judge Learned Hand's premise that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary;  but to remember that statutes always have some purpose or object to accomplish whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.1945). As Chief Justice Marshall said while discussing the Commerce Clause in *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 189, 6 L.Ed. 23 (1824), "[w]e know of no rule for construing the extent of such powers, other than as given by the language of the instrument which confers them, *taken in connection with the purpose for which they were conferred.*" (emphasis supplied).

Thus, "there is no surer way to misread any document than to read it literally." L. Hand, J., concurring in *Guiseppi v. Walling,* 144 F.2d 608, 623-24 (2d Cir.1944), *quoted* in Archibald Cox, *Judge Learned Hand and the Interpretation of Statutes,* 60 Harv. L.Rev. 370, 375-76 (1947). While it may be true that "whatever the consequences, we must accept the plain meaning of plain words," *United States v. Brown,* 206 U.S. 240, 244, 27 S.Ct. 620, 51 L.Ed. 1046 (1907) (Holmes, J.), we should be able to say, after having looked at the purpose of a statute to understand the context in which the words are spoken, "if this be the

literal construction of the sentence, it is still more apparently its real meaning." *Schooner Paulina's Cargo v. United States,* 11 U.S. (7 Cranch.) 52, 64, 3 L.Ed. 266 (1812) (Marshall, C.J.).

Happily, in this case, Judge Carnes's view of the literal meaning of the words here involved is, when viewed within the purpose and context of SHVIA, "still more apparently [their] real meaning."

I agree with appellant that SHVIA did not merely respond to court-ordered cut-offs, such as those imposed by the district court in this case, but also sought to ensure access to satellite broadcasts, in particular for rural owners of C-Band dishes.

SHVIA, as I read it, was a full review and restructuring of the satellite transmissions statutes designed to benefit consumers and to ensure the viability of the satellite industry as well as to recognize developments in technology which had made the use of rooftop antennas in many ways obsolete. As Senator Leahy remarked in the Congressional Record of August 5, 1999, "I want to make sure that Vermonters will be offered the full range of TV services of satellite once we can negotiate the final bill ... I am in the same situation as many Vermonters. At my home in Middlesex, Vermont, I only receive one local network channel clearly with my rooftop antenna." 145 Cong.Rec. S10357-02. The bill, sponsored by Senator Leahy without objection, failed to pass because a Conference with the House could not be set up.

Fellow Senators supporting the bill included not only Senator Hatch, Senator McCain, the ranking member of the Antitrust Subcommittee, and Senator Lott, the Majority Leader of the Senate, but also Senator Kohl. The latter had spoken about the Leahy bill, observing that the Act "g[a]ve satellite carriers the ability to provide local television broadcast signals (while appropriately phasing in must-carry), reduce[d] the royalty fees for those signals, g[a]ve the FCC time to take a much-needed second look at the definition of 'unserved households,' and ma[d]e sure no one—no one—is terminated before February 28th of next year." 144 Cong.Rec. S10525 (September 17, 1998).

When the House passed H.R. 1554, the bill which actually became SHVIA, House Commerce Committee Chairman Bliley of Virginia referred to it as "a better approach. It is a procompetitive solution to the cable's dominant market share." 145 Cong.Rec. H2319 (April 27, 1999). And the Conference Report on SHVIA, echoing the theme of satellite competition with the cable industry but also emphasizing the importance of permitting satellite television to provide rural households service, explained:

> When Congress passed the Satellite Home Viewer Act in 1988, few Americans were familiar with satellite television. They typically resided in rural areas of the country where the only means of receiving television was through use of a large, backyard C-band satellite dish. Congress recognized the importance of providing these people with access to broadcast programming, and created a

compulsory copyright license in the Satellite Home Viewer Act that enabled satellite carriers to easily license the copyrights to the broadcast programming that they retransmitted to their subscribers.

Conference Report, at 91, *reprinted in* 145 Cong. Rec. H11792 (Nov. 9, 1999).

In 1999, referring to SHVIA in its final form, Senator Leahy reiterated:

[U]nder current law many families must get their local TV signals over an antenna which often does not provide a clear picture....  While the hills and mountains of Vermont are a natural wonder, they are barriers to receiving clear TV signals over-the-air with roof top antennas.

145 Cong.Rec. S700 (January 19, 1999) (quotations omitted).

I could go on, but the above will suffice to make it clear that SHVIA had not only to do with court-ordered cut-offs, but with the broader purpose of giving rural television owners more up-to-date reception while making satellite providers more competitive with cable television.  In context, the literal words of the statute are supportive of its broader purpose, and I therefore am doubly pleased to concur in Judge Carnes's fine opinion.