CARNES, Circuit Judge,
dissenting:
Congress enacted a statute providing that any state-chartered bank may “charge on any loan ... interest ... at the rate allowed by the laws of the State ... where the bank is located.” 12 U.S.C. § 1831d(a). Everyone agrees Congress intended to ensure that the maximum interest rate a bank like BankWest, which is chartered in South Dakota, can charge on loans made in another state is the higher rate permitted under South Dakota law, not the lower rate that the other state prefers. To prevent states from interfering with the right to charge higher interest rates that it created, Congress explicitly provided that the right exists “notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section.” Id. Congress probably thought that using broad language to create the federal right and inserting a clear and unequivocal preemption clause to protect that right from state interference would be enough. If so, it underestimated the State of Georgia’s determination to evade federal law and the willingness of this Court to permit states to do so.
The majority opinion attempts to paint this case as one in which a bunch of cunning cash advance stores have purchased the authority of out-of-state banks as part of their scheme to get around Georgia’s usury laws. In this picture, BankWest and other out-of-state banks are not real players but instead only passive pawns that lease their charters to the cash advance stores; those stores are actually the lenders, perform all the critical functions, carry most of the risk, and to use the majority’s phrase “effectively do all the work.” Ante, at 1294. That’s not a pretty picture, but neither is it one the record in this case supports.
The record shows that it is the banks, and not the cash advance stores, that perform the critical loan functions. The parties agree that BankWest and Advance America are exemplars of the out-of-state banks and their in-state agents, and the record contains the contractual agreement between them. Under that agreement, it is BankWest that provides all of the funds that are loaned. Advance America provides none. It is BankWest that determines which borrowers will receive a loan because, as an undisputed affidavit establishes, BankWest “in its sole discretion, determines all underwriting criteria that must be satisfied by a prospective borrower.” Advance America has no control over *1313 the underwriting criteria that BankWest applies to these loans.[1]
The affidavits show that “BankWest also establishes, in its sole discretion, the terms and features of the loans, including the loan amounts, fees and charges, interest rate, repayment terms, credit limits and credit standards.” By contrast, “Advance America has no control or authority over the loan approval process, underwriting criteria, credit terms, credit standards or the terms and conditions of the loans between BankWest and its Georgia borrowers.” Not only that, but Advance. America is not even a party to the loan agreement. Instead, “[t]he Loan Agreement is a promissory note between the borrower and BankWest, which, among other things, clearly states that BankWest is the lender on the loan, and obligates the borrower to repay the loan with interest to BankWest on or before the stated maturity date.” Nor does Advance America have a legal right to the loan receivables. Instead, “[t]he loan receivables are BankWest’s assets, and BankWest records them as such on the bank’s financial statements.”[2]
Advance America bears no risk of loss of principal, because it advances none of the principal. BankWest advances all of the principal and bears all of the risk that principal will be lost. The only risk of loss that Advance America has is for part of the loan revenues (the finance charges).
The way the contractual loss assignments have played out in the real world of cash advance loans in Georgia is that Ban-kWest has borne twice as much of the loan loss as Advance America. The record contains this sworn statement about the actual loss data for the fourteen-month period just before the filing of the motion for injunction: “For the period of January 2003 through February 2004, the Loss Rate Standard on the aggregate portfolio of loans made by Bankwest to Georgia borrowers was approximately 12.5%. Thus, BankWest was responsible for approximately 68% of all loan losses incurred during that period.”[3] So, Advance Amer *1314 ica suffered less than one-third of the losses, BankWest more than two-thirds.
The facts, then, are that BankWest is the true lender. It is not only identified as such in the loan documents, but it also performs all of the critical loan decision-making functions, supplies all of the funds for the loan, is the only one exposed to any loss of principal, and has borne most of the loan losses that have actually occurred.
The factual spinning and loaded language of the majority opinion aside, the real defect in that opinion is its express preemption analysis. The Supreme Court has instructed us that: “In deciding whether a federal law pre-empts a state statute, our task is to ascertain Congress’ intent in enacting the federal statute at issue. Pre-emption ... is compelled [when] Congress’ command is explicitly stated in the statute’s language .... ” Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983) (internal quotations omitted).[4] Here, Congress’ preemptive command is explicitly stated in the statutory language. Yet the majority decision does not obey that clear, compelling command.
The relevant portion of FDIA § 27(a) plainly says that “State-chartered insured depository institutions ... may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, ... charge on any loan ... interest ... at the rate allowed by the laws of the State ... where the bank is located.”[5] 12 U.S.C. § 1831d(a) (emphasis added). The question is not *1315 whether Congress intended to preempt state laws inconsistent with the right it created on behalf of out-of-state banks. The preemptive command could not be clearer. To the extent that “any State constitution or statute” attempts to define, condition, impinge upon, regulate, restrict, or otherwise affect the right of an- out-of-state bank to charge an interest rate permitted under the laws of its charter state, that state law is preempted.
Because the scope of the preemption is coextensive with the federal right created, the question is the scope of the federal right. The key statutory word defining the scope of the federal right, the word upon which this issue turns, is “any.” Section 27(a) says that state-chartered insured depository institutions may charge “on any loan” interest at the rate allowed by the laws of their charter state. 12 U.S.C. § 1831d(a) (emphasis added). “Any” is a powerful word.
Both the Supreme Court and this Court have made clear that “any” does not mean “some” or “all but a few,” it means “all.” For example, in United States v. Gonzales, 520 U.S. 1, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997), the question was whether the statutory phrase “ ‘any other term of imprisonment’ means what it says or whether it should be limited to some subset of prison sentences.” Id. at 5, 117 S.Ct. at 1035 (internal quotation omitted). Because of the natural, expansive meaning of the word “any,” and the absence of any limiting language in the statute, the Court concluded that “any term of imprisonment” meant all terms of imprisonment, without exception. Id.
Other decisions of the Supreme Court and this Court emphasize and re-emphasize that “any” does not mean some, or most; it means all. ■ See, e.g., United States v. Alvarez-Sanchez, 511 U.S. 350, 358, 114 S.Ct. 1599, 1604, 128 L.Ed.2d 319 (1994) (noting that a statute referring to “any law enforcement officer” includes “federal, state, or local” officers); CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1223 (11th Cir.2001) (holding that “ ‘any termination’ in the Improvement Act’s § 1005(a)(2)(B)(iii) grandfather clause means all terminations of any kind”); Coronado v. Bank Atl. Bancorp, Inc., 222 F.3d 1315, 1321-22 (11th Cir.2000) (holding that immunity under 31 U.S.C. § 5318(g)(3) for “any person under any law or regulation of the United States or any constitution, law, or regulation of any State” refers to all persons and all laws); Merritt v. Dillard Paper Co., 120 F.3d 1181, 1185-86 (11th Cir.1997) (deciding that “participation] in any manner” as used in anti-retaliation provision means “all” kinds of participation, even involuntary trial testimony).
In this case, we should interpret the statutory phrase “any loan” to-mean all loans without exception, just as the Supreme Court in Gonzales interpreted the statutory phrase “any other term of imprisonment” to mean all other terms of imprisonment without exception, 520 U.S. at 5, 117 S.Ct. at 1035; just as the Supreme Court in Alvarez-Sanchez interpreted “any law enforcement officer” to mean all law enforcement officers without exception, 511 U.S. at 358, 114 S.Ct. at 1604; and just as we in Merritt interpreted “any termination” to mean all terminations of any kind without exception, 120 F.3d at 1185-86.[6]
*1316 Because loans that out-of-state banks make through in-state agents are within the broad scope of the term “any loan,” § 27(a) preempts state laws that attempt to-regulate or restrict the interest rates that may be charged on those loans. In other words, § 27(a) preempts what the State of Georgia has done. It is as though the Georgia General Assembly rewrote the key language of that federal statutory provision by adding a sentence, so that it reads:
State-chartered insured depository institutions ... may ... charge on any loan ... interest ... at the rate allowed by the laws of the State ... where the bank is located. But they may not do so through agents unless the bank receives the majority of the proceeds generated by the loan.
Preemption would be a meaningless doctrine if states could effectively rewrite federal statutes by adding conditions or limitations. In this instance, the rewrite would change the established, all-encompassing meaning of “any” as it is used in § 27(a). Language that limits the meaning of congressionally chosen terms must come from Congress, not from the states. Just as a state cannot say for purposes of § 27(a) what a “State-chartered insured depository institution” is, it cannot say when such an institution is the entity “charging]” the interest on a loan, and it cannot say what “any loan” is.' Those are federal statutory terms. The power to define or redefine federal statutory terms is the power to evade or eviscerate these terms; it is the power to preempt the preemptive force of federal statutes, and it is a power the states do not have.
With mimicry that would make a mockingbird blush, the majority opinion has lifted the analytical device from the preceding paragraph of this opinion and inserted different words in an attempt to show that Congress did not envision the particular evasion enacted by Georgia. See ante, at 1307. The majority’s point, I suppose, is that Congress did not say out-of-state banks could use in-state agents under the specific contractual terms that BankWest uses Advance America. Of course it didn’t. It is impossible to anticipate all the ways in which business will be done, just as it is impossible to anticipate all the ways in which states will attempt to thwart the preemptive will expressed in a federal statute. That is why Congress chose to use the all-encompassing term “any” in § 27(a) instead of more limited terms such as “some,” “many,” or “most.”
Faced with the broad language of § 27(a), the majority opts to deny the undeniable. Even though the language the federal statute uses is broad, the statute’s application is, the majority insists, “quite narrow.” Ante, at 1305. The majority lists all the activities of out-of-state banks that Congress did not specifically mention in § 27(a), which means under the “quite narrow” view that Georgia can regulate those activities into oblivion. The targeta-ble activities that are left unprotected by the preemption clause of § 27(a), the majority insists, include “collateral activity associated with the loan, such as marketing, advertising, solicitation, or any aspect of the loan procurement process” and “collection practices,” and the matter of “separate contracts between out-of-state banks and in-state vendors.” Ante, at 1304.
So anemic are the provisions of the federal act under the majority’s “quite narrow” view that states can prohibit out-of-state banks from using in-state agents at all, because § 27(a) says “nothing about *1317 agents, much less in-state, non-bank agents of out-of-state banks,” and because it “directly restricts only interest-rate limitations and cannot be so expanded to cause indirect preemption of the agency agreement between in-state entities, such as payday stores, and out-of-state banks.” Ante, at 1305 n. 25. In other words, the majority’s “quite narrow” view is that states may thwart the preemption clause of § 27(a) by regulating agency relationships or prohibiting preferred forms of them, and by going after the “collateral activity associated with” making loans, activities that are essential for an out-of-state bank to function in another state. See ante, at 1304 (emphasis omitted).
And that is what Georgia has done. The theory with which Georgia has cloaked its evasive purpose is that where the in-state agent has the predominant economic interest in a loan, which Georgia considers to be the right to more than fifty percent of the loan-generated revenues, the in-state agent is the actual lender, not the out-of-state bank. See Ga.Code Ann. § 16 — 17— 2(b)(4) (“A purported agent shall be considered a de facto lender if the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan.”); see also Ga.Code Ann. § 16-17-6. Georgia’s purpose is to get at the agent as a way of getting at the principal. Controlling a corporation’s agents controls the corporation, just as binding a man’s arms and legs binds the man.
If Georgia may do as it pleases to the instate agents of out-of-state banks, then Georgia may do as it pleases to the out-of-state banks. Recognizing that, the state takes the position that federal rights of corporations may be conditioned, truncated, or abrogated by state laws so long as those laws are brought to bear on the agents through which the corporations act. And the majority has written that untenable position into the law of this circuit. Section 27(a) grants out-of-state banks the authority to make loans in Georgia at the interest rates they may charge in their charter states. The State of Georgia may no more prevent that authority from being exercised through in-state agents than it may prevent that authority from being exercised on even-numbered days.
Not content with gutting the preemption clause of the federal act, the majority also tries to soft-peddle the plain language of the Georgia Act to make it seem as though all the Act does is affect one little bitty aspect of the agency relationship between out-of-state banks and in-state agents. That is not the reality. The reality is that Georgia has acted to strip from out-of-state banks the right that § 27(a) gives them, if those banks structure their business in the way that they think best in light of business considerations and market forces. What Georgia has said is that the out-of-state banks Congress has specifically protected from state usury laws will not be protected by § 27(a) unless those banks quit doing business the way they prefer and start doing business the way the state prefers. And it just so happens that Georgia prefers that out-of-state banks covered by § 27(a) not do business in the way those banks have chosen to do it. What a coincidence.
Of course, Georgia does not actually care one whit about how the banks do business. All the state is concerned with is whether the banks exercise their federal statutory right to charge § 27(a) interest rates. The banks and their in-state agents can structure their relationship any way they want and can divide up revenue according to the phases of the moon insofar as Georgia is concerned, IF only the banks will give up their federal right to charge higher interest rates than state law allows. *1318 Georgia has effectively put a price on the exercise of the federal statutory right, the price being that banks cannot structure their business relationships the way they have chosen. By slapping that price tag onto § 27(a), Georgia has conditioned the exercise of a federal right on compliance with the state’s dictates, even though the federal statute granting the right explicitly preempts state laws on the subject. And the majority is letting Georgia get away with doing that.
The authority the State of Georgia claims in this regard would have no limit. If Georgia can decide that lending at charter-state interest rates is prohibited where the in-state agent has the predominant economic interest in the loan-generated revenue — that “any loan” in the federal statute does not mean all loans — it can decide that lending is prohibited where the in-state agent has an interest in one-fourth of the loan-generated proceeds, or in one-tenth of them, or where the in-state agent has any interest in them at all. Under the majority’s “quite narrow” view of the preemptive force of § 27(a), Georgia could simply declare that, under its own definition of the federal statutory terms, any instate agent of an out-of-state bank is the de facto lender, not the bank. The majority embraces that position.[7]
None of this is to say that Georgia may not reasonably regulate in-state agents of out-of-state banks, so long as it does so on the same terms that it regulates agents of in-state banks. For example, if Georgia wants to forbid banks from using agents who have been convicted of felonies, nothing in § 27(a) would prevent it from doing so. But that prohibition would have to be interest-rate neutral, which is to say that Georgia’s regulation of agents may not be keyed to a bank’s exercise of its § 27(a) interest-rate authority. Georgia may not forbid an out-of-state bank charging § 27(a) protected rates from using any arrangement that it permits a bank not charging those rates to use. More specifically, Georgia may not forbid, restrict, or condition the use of agents generally, or particular categories of agents, as a way of preventing an out-of-state bank from using those agents to exercise its federal statutory right to charge higher interest rates.
Yet that is precisely what Georgia has done. Georgia does not generally forbid the use of agents by banks when the agents have a “predominant economic interest” in loan-generated revenue. It permits banks to use agents regardless of how the economic interests are divvied up by them, so long as they do not charge the higher interest rates that § 27(a) permits. If BankWest were not attempting to exercise the higher interest rate authority Congress has given it, Georgia’s law would not apply regardless of whether Advance America received half, three-fourths, nine-tenths, or all of the loan-generated revenues. Georgia does not care how much of the revenue an agent receives so long as the agent is not used in the exercise of an out-of-state bank’s federally protected right to charge higher interest rates than state law allows. Only because Ban-kWest’s arrangement with Advance America serves to further its federally granted § 27(a) authority does Georgia want to “regulate” that relationship. It wants to “regulate” principal-agent relationships used to effectuate § 27(a) rights in the *1319 same way that the American Temperance League wanted to “regulate” alcohol.
Don’t get me wrong. The fact that § 27(a) preempts the Georgia Act’s attempt to restrict an out-of-state bank’s ability to export interest rates does not mean that any transaction where an out-of-state bank associates with a non-bank agent in Georgia is protected, even if the relationship is clearly a sham. If, under federal law, a transaction is not actually a loan from an out-of-state bank within the meaning of § 27(a), then the bank does not have the right to export its charter state’s interest rate under § 27(a). That is, however, an issue that must be answered under federal law, not under state law. Georgia has not argued that the loans involved in this case are shams under federal law, but instead has attempted to' use state law to redefine federal statutory terms, which is something it may not do.
I recognize the serious policy concerns that motivated the Georgia General Assembly to enact this legislation, and if I were in Congress I might well support an amendment of § 27(a) on those grounds. But I am not in Congress. Neither are my two colleagues who are in the majority in this case. Our duty is to interpret the laws that Congress has enacted, not to shape them to our policy views through a “quite narrow” interpretation. Any complaints about the policy effects of § 27(a) are, to borrow a phrase from, the Supreme Court in another banking case, “better addressed to the wisdom of Congress than to the judgment of this Court.” Marquette Nat’l Bank of Minneapolis v. First of Omaha Serv. Corp., 439 U.S. 299, 319, 99 S.Ct. 540, 550-51, 58 L.Ed.2d 534 (1978).
Because § 27(a) expressly preempts the Georgia Act with regard to its regulation of interest rates charged by out-of-state banks, I would hold that the out-of-state banks and their in-state agents have met their burden of demonstrating the first prong of the preliminary injunction determination, which is a substantial likelihood of success on the merits. As for the second prong, the district court found, and the State of Georgia does not dispute, that the banks and their agents have sufficiently demonstrated irreparable harm.
In analyzing the third prong, the district court found that the threatened injury to the out-of-state banks and their in-state agents did not outweigh the damage the injunction would cause to the citizens of the State of Georgia, and as a result that they had not met their burden on this prong. In the three sentences devoted to this topic, the district court summarily found that “[a]n injunction against enforcement of the Act would permit payday lenders to continue collecting exorbitant amounts of interest from thousands of Georgia citizens who can ill afford it.” BankWest, Inc. v. Baker, 324 F.Supp.2d 1333, 1357 (N.D.Ga.2004). That finding is defensible only if one assumes, as the district court had concluded, that the Georgia Act is not expressly preempted by § 27(a). But it is preempted, and that changes things. In the words of the Fifth Circuit, “[sjince Congress expressly preempted this area of regulation, the states are not injured by the injunction” and “there is no injury to the states to weigh.” See Trans World Airlines, Inc. v. Mattox, 897 F.2d 773, 784 (5th Cir.1990), holding recognized as limited on other grounds by Johnson v. Baylor Univ., 214 F.3d 630 (5th Cir.2000).
The same analysis holds true with regard to the fourth prong of the preliminary injunction analysis. Issuing an injunction to ensure the-proper operation of federal law is not adverse to the public interest. See id. The public interest is best served by applying federal law as directed by the express language of § 27(a).
*1320 Because the out-of-state banks and their in-state agents have met their burden on each of the four prongs of the preliminary injunction analysis, the district court abused its discretion in failing to grant them a preliminary injunction. Accordingly, I dissent.

.The majority opinion says that BankWest uses "Tele-Track,” a third-party loan-processing agent to approve or disapprove loans, and that Advance America also uses Tele-Track in states where Advance America makes loans in its own name. Ante, at 1295 & n. 5. We are not told the significance of that fact. It may be that BankWest and Advance America also use the same brand of copy machine or the same long-distance carrier, but so what?
The majority may be hoping that some readers will infer from the fact that Tele-Track is commonly hired to apply a lender’s loan criteria that BankWest and Advance America use the same loan criteria. The record provides no' support at all for that inference; it is silent about what underwriting criteria Advance America uses when making loans itself instead of acting as an agent for a lender. The record, however, does show something on that subject about three other cash advance stores that serve as Georgia agents for out-of-state banks. It shows that when those stores are located in states that allow them to make this type of loan directly to consumers, they use different underwriting criteria than the out-of-state banks use in Georgia.

. In what is more a questionable implication than a misrepresentation, the majority opinion says that: “Accordingly, the local payday stores in this case have entered into arrangements with out-of-state banks to serve as their agents in Georgia.” Ante, at 1294. That sounds as though the payday stores sought out the banks. There is nothing in the record to show who sought out whom. It would be just as accurate to say that the banks entered into arrangements with those stores to serve as the banks’ agents in Georgia. In fact, an affidavit in the record does put it that way: "BankWest contracted with Advance America to act as BankWest’s authorized fiscal agent in Georgia

. Maybe a little more explanation will help. BankWest was responsible for loan losses up to the first 8.5 percent of the finance charges. Because the loan loss was 12.5 percent of the finance charges, and BankWest was responsible for the loan loss on the first 8.5 percent of the finance charges, it shouldered 68 percent *1314 of the loan loss for that fourteen-month period. (8.5% 12.5% = 68%).

. There is, to be sure, an "assumption that the historic police powers of the states are not superceded by federal law unless preemption is the clear and manifest purpose of Congress,” Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1122 (11th Cir.2004), but just as surely, that " 'assumption' of non-preemption is not triggered when the State regulates in an area where there has been a history of significant federal presence,” United States v. Locke, 529 U.S. 89, 108, 120 S.Ct. 1135, 1147, 146 L.Ed.2d 69 (2000). Usury laws are an exercise of the historic police powers of the states, but there has been a history of significant federal presence in banking, particularly interest rates on a national scale. Indeed, a heavy federal presence in the field and extensive federal regulation of national interest rates extends back at least as far as the 1884 amendments to the National Bank Act of 1864. See Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S, 25, 32-34, 116 S.Ct. 1103, 1108-09, 134 L.Ed.2d 237 (1996); see also Franklin Nat'l Bank of Franklin Square v. New York, 347 U.S. 373, 375-76, 74 S.Ct. 550, 552-53, 98 L.Ed. 767 (1954). Section 27(a) of the FDIA is part of that federal scheme, and, in fact, mirrors § 85 of the NBA. Compare 12 U.S.C. § 1831d(a), with 12 U.S.C. § 85. Because the Georgia Act attempts to interfere with the federal right of out-of-state banks to apply their charter-state interest rates nationally, it is not entitled to the benefit of a presumption against preemption.

. Section 27(a) states in full:
In order to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank or insured branch of a foreign bank would be permitted to charge in the absence of this subsection, such State bank or such insured branch of a foreign bank may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.
12 U.S.C. § 1831d(a).

. The Supreme Court's recent decision in Small v. United States, 544 U.S. -, 125 S.Ct. 1752, 161 L.Ed.2d 651 (2005), does not dictate a different interpretation here. In that case, the Court dealt with 18 U.S.C. § 922(g)(1)’s prohibition on the possession of firearms by persons who had been "convicted in any court” of a felony. Id. at 1754. .The Court began with "the legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application.” Id. at 1755. Finding "no convincing indication to the contrary” of that presump *1316 tion, the Court concluded that § 922(g)(l)’s reference to convictions entered in “any court” means convictions entered in a domestic court. Id. at 1756. No such presumption applies here where all the parties and transactions involved in this case are domestic.

. The majority states: "Indeed, the language of § 27(a) says nothing about the loan procurement or collection practices by agents and nothing about agents, much less in-state, non-bank agents of out-of-state banks. Instead, § 27(a) directly restricts only interest-rate limitations and cannot be so expanded to cause indirect preemption of the agency agreement between in-state entities, such as payday stores, and out-of-state banks.” Ante, at 1305 n. 25 (emphasis in original).