**BANKWEST, INC., et al., Plaintiffs,**

v.

**Thurbert E. BAKER, et al., Defendants.**

No. CIV.A 1:04–CV–988–MHS.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 13, 2004.

**1338**

Ashley Carraway, Atlanta Legal Aid Society, Atlanta, GA, Gary Jay Leshaw, Leigh Braslow Altman, Gary Leshaw and Associates, Decatur, GA, for Center for Responsible Lending (CRL), AARP, Atlanta Legal Aid Society, Inc., Consumer Federation of America, Georgia Legal Services Program, Georgia Watch, National Association of Consumer Advocates, National Consumer Law Center, Community Financial Services Association of America, Ltd., movants.

Michael C. Russ, King & Spalding, Martin Moody Wilson, Alan William Loeffler, Troutman Sanders, Robert A. Bartlett, Charles E. Campbell, Larry Dwight Floyd, Jr., McKenna Long & Aldridge, Atlanta, GA, Charles K. Seyfarth, phv, Robert M. Buell, phv, Bowman and Brooke, Richmond, VA, for BankWest, Inc., Advance America, Cash Advance Centers of Georgia, Inc., plaintiffs.

Sidney R. Barrett, Jr., Isaac Byrd, Thurbert E. Baker, Samantha M. Rein, Office of State Attorney General, Atlanta, GA, for Thurbert E. Baker, Attorney General of the State of Georgia, in his official capacity, Cathy Cox, Secretary of State of the State of Georgia, in her official capacity, defendants.

### ORDER

SHOOB, Senior District Judge.

These consolidated cases[1] came on for hearing on April 27, 2004, on plaintiffs' motions for a preliminary injunction enjoining enforcement of Georgia's new payday lending law, Act No. 440 (S.B. 157), to be codified at O.C.G.A. §§ 16–17–1 et seq. (the Act),[2] on the grounds that it is unconstitutional. The Act was to go into effect on May 1, 2004. On April 30, 2004, in order to provide time for the Court to consider the voluminous filings submitted by the parties, the Court entered a temporary restraining order restraining enforcement of the Act against plaintiffs until May 15, 2004. Now, after carefully reviewing the briefs,[3] affidavits, and other evidence submitted, and considering the arguments of counsel, the Court enters the

---

1. On April 22, 2004, the Court consolidated the following four cases: *BankWest, et al. v. Baker, et al.*, Civil Action No. 1:04–CV–988–MHS (designated as lead case); *Community, State Bank, et al. v. Baker, et al.*, Civil Action No. 1:04–CV–992–MHS; *First Bank of Delaware, et al. v. Baker, et al.*, Civil Action No. 1:04–CV–1028–MHS; and *County Bank of Rehoboth Beach, Delaware, et al. v. Baker, et al.*, Civil Action No. 1:04–CV–1061–MHS.

2. The Act also amends existing Georgia Code sections 7–3–29 and 16–14–3.

3. The Court grants the motions of the following non-parties to file briefs *amicus curiae:* Community Financial Services Association of America, Ltd.; AARP; Atlanta Legal Aid Society, Inc.; Consumer Federation of America; Georgia Legal Services Program; Georgia Watch; National Association of Consumer Advocates; National Consumer Law Center; and Center for Responsible Lending.

following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). Based on its findings and conclusions, the Court denies plaintiffs' motions.

## FINDINGS OF FACT

### I. The Parties

Plaintiffs are state-chartered banks located in South Dakota and Delaware (the Banks) and their non-bank agents (the Agents).

The Banks are BankWest, Inc., and Community State Bank, both located in South Dakota, and First Bank of Delaware and County Bank of Rehoboth Beach, Delaware. The Banks' deposits are insured by the Federal Deposit Insurance Corporation (FDIC). As "insured depository institutions," 12 U.S.C. § 1813(c)(2), the Banks are subject to supervision, regulation, and examination by the FDIC.

The Agents are Advance America, Cash Advance Centers of Georgia, Inc. (Advance America), a Delaware corporation with its principal place of business in Spartanburg, South Carolina; First American Cash Advance of Georgia, LLC, a Tennessee limited liability company; Cash America Financial Services, Inc., a Delaware corporation; Georgia Cash America, Inc., a Georgia corporation; Creditcorp of Georgia, LLC, a Delaware limited liability company; and Express Check of Georgia, LLC, a Tennessee limited liability company. As "institution-affiliated parties," 12 U.S.C. § 1813(u)(1), they are also subject to supervision, regulation, and examination by the FDIC.

Defendants are Thurbert E. Baker, Attorney General of Georgia, and Cathy Cox, Secretary of State of Georgia. Both are sued in their official capacities only.

### II. Plaintiffs' Payday Lending Programs

Plaintiffs make small, short-term loans to Georgia borrowers at very high interest rates. The loans are single-advance, single-payment loans in amounts up to $500 for terms of four to forty-five days. The maturity date usually coincides with the borrower's next payday, so the loans are often called "payday loans."

At maturity, the borrower is required to repay the principal amount advanced plus a finance charge or fee of anywhere from 17% to 27% of the amount advanced, depending on the term of the loan. For a two-week loan, these charges are equivalent to an annual percentage rate (APR) of interest between 443% and 520%.

The loans are evidenced by a loan agreement or promissory note containing disclosures required by the federal Truth in Lending Act, including APR, finance charge, amount financed, and total of payments. The agreement or note also contains a waiver of jury trial and arbitration agreement providing that all disputes, except those within the jurisdiction of a small claims tribunal, must be resolved through binding arbitration. The arbitration agreement includes a waiver of the right to participate in a class action, either as a class representative or a class member.

The Banks, which have no physical presence in Georgia, entered into agreements with the Agents to market and service the payday loans.[4] Under the agreements, the

---

4. Only one of these agreements-the Marketing and Servicing Agreement between BankWest and Advance America-is in the record before the Court. Due to proprietary concerns, the other plaintiffs have chosen to rely on descriptions of the terms of their agreements in their verified complaints or affidavits. At the conclusion of the preliminary injunction hearing, counsel for the Community State Bank and First Bank of Delaware plaintiff groups offered to submit their agreements to the Court for *in camera* review if the Court so desired.

Agents are responsible for establishing retail stores where borrowers can apply for and obtain loans, marketing the loans, servicing the loan applications, collecting payments on the loans, maintaining records, and reporting to the Banks. The Banks are responsible for establishing the terms and features of the loans, including the loan amounts, fees and charges, interest rates, repayment terms, credit limits, and credit standards.

The Agents receive loan applications from prospective borrowers at their stores in Georgia and transmit the application information to the Banks' loan processing agents for approval or denial.[5] If the loan is approved by the Bank, the Agent obtains from the borrower a signed loan agreement or promissory note, which identifies the Bank as the lender, and a personal check payable to the Bank in the amount of the loan plus interest. The Agent then provides the borrower a loan funding check, which is issued electronically by the Bank, signed by an officer of the Bank, and drawn on an account owned by the Bank. The Agents receive all payments and collections on the loans and deposits them into local bank accounts owned by the Banks.

As compensation for their services, the Agents receive a fee calculated according to a formula contained in their respective marketing and servicing agreements. In the case of BankWest and Advance America, the fee is $13.80 for every $100 loaned, which is equal to 81% of the revenues generated by the loan. In the case of Community State Bank and First Bank of Delaware, the record does not reflect the precise amount of their Agents' compensation, but their respective verified complaints allege that the fees "represent a predominant share of Loan revenues."

The record does not reflect the amount of the fee paid by County Bank of Rehoboth Beach, Delaware, to its Agent, Express Check.

The Agents pay all of the costs of operating their stores, including rent; employee salaries and benefits; equipment, fixtures, and improvements; taxes; advertising; and all costs of complying with record-keeping and reporting requirements.

### III. The Act

The Act amends Georgia's criminal code, Title 16, by adding an entirely new Chapter 17. The Act also amends the existing Georgia Industrial Loan Act, O.C.G.A. § 7-3-29, to permit class actions against unlicensed lenders, and Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act, O.C.G.A. § 16-4-3, to include payday lending in the definition of racketeering activity.

The Act broadly defines "payday lending" to include "all transactions in which funds are advanced to be repaid at a later date, notwithstanding the fact that the transaction contains one or more other elements . . . ." O.C.G.A. § 16-17-1(a). This broad definition, however, expressly incorporates the exceptions and examples contained in later sections of the Act. Id.

It is the express general intent of the Act "to reiterate that in the State of Georgia the practice of engaging in activities commonly referred to as payday lending . . . are currently illegal and to strengthen the penalties for those engaging in such activities." O.C.G.A. § 16-17-1(e).

The Act sets out the General Assembly's determination "that various payday lenders have created certain schemes and

---

**5.** The evidence shows that both BankWest and Community State Bank use an automated database and credit scoring service known as Tele-Track to determine whether to approve a loan application.

methods in order to attempt to disguise these transactions or to cause these transactions to appear to be 'loans' made by a national or state bank chartered in another state in which this type of lending is unregulated, even though the majority of the revenues in this lending method are paid to the payday lender." O.C.G.A. § 16–17–1(c).

The General Assembly goes on to declare "that the use of agency or partnership agreements between in-state entities and out-of-state banks, whereby the in-state agent holds a predominant economic interest in the revenues generated by payday loans made to Georgia residents, is a scheme or contrivance by which the agent seeks to circumvent Chapter 3 of Title 7, the 'Georgia Industrial Loan Act,' and the usury statutes of this state." *Id.*

The Act makes it unlawful for any person to engage in any business "which consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less," unless one of several enumerated exceptions applies. O.C.G.A. § 16–17–2(a). The exceptions cover (1) persons engaging in financial transactions permitted under various other Georgia laws, including the Georgia Industrial Loan Act and the law relating to interest and usury; (2) loans that are lawful under the terms of other designated Georgia laws, such as that relating to pawnbrokers; and (3) qualified tax refund anticipation loans. O.C.G.A. § 16–17–2(a)(1),(2), and (4).

The Act also exempts banks, such as the plaintiff Banks in this case, that are chartered under the laws of another state and insured by the Federal Deposit Insurance Corporation (FDIC). Specifically, the Act provides that the prohibition on payday lending does not apply to "a bank or a thrift chartered under the laws of the United States, a bank chartered under the laws of another state and insured by the Federal Deposit Insurance Corporation, or a credit card bank," so long as such bank or thrift "is not operating in violation of the federal and state laws applicable to its charter." O.C.G.A. § 16–17–2(a)(3). This exception, however, is "[s]ubject to the provisions of paragraph (4) of subsection (b) of this Code section." *Id.*

Code section 16–17–2(b)(4), in turn, provides that a loan is subject to the Act "notwithstanding the fact that the transaction also involves ... [a]ny arrangement by which a de facto lender purports to act as the agent for an exempt entity." It further provides: "A purported agent shall be considered a de facto lender if the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan." *Id.*

In a separate but related provision, the Act provides that in an action under the law, "[i]f any entity involved in soliciting or facilitating the making of payday loans purports to be acting as an agent of a bank or thrift, then the court shall be authorized to determine whether the entity claiming to act as an agent is in fact the lender. Such entity shall be presumed to be the lender if, under the totality of the circumstances, it holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan."[6] O.C.G.A. § 16–17–6.

The Act also provides that "[a]n arbitration clause in a payday loan contract shall not be enforceable if the contract is unconscionable." O.C.G.A. § 16–17–2(c)(2). In determining whether a contract is uncon-

---

6. Read together with the "shall be considered" language of Section 16–17–2(b)(4), the presumption referred to in this section is clearly not rebuttable.

scionable, the court is required to "consider the circumstances of the transaction as a whole." *Id.* The Act includes a non-exclusive list of the relevant circumstances that a court should consider in this regard, including "[w]hether the contract restricts or excludes ... the right to participate in a class action." *Id.*

The Act imposes very severe penalties on violators and those who aid or abet violations. A person who violates the Act or aids or abets such a violation, including any arbiter or arbitration company, is guilty of a misdemeanor of a high and aggravated nature and is subject to imprisonment for up to one year and/or a fine of up to $5,000. After three prior convictions, any subsequent convictions are considered felonies punishable by a fine of $10,000 or five years imprisonment or both. O.C.G.A. § 16–17–2(d). Violators are also barred from collecting any indebtedness created by illegal loans, which are declared void *ab initio*, and are subject to civil suit by borrowers, including class actions, in which the borrowers may recover treble damages plus attorneys' fees.

The Act also provides for civil penalties equal to three times the amount of interest or charges on illegal loans and authorizes the Attorney General, any district attorney, or a private party to bring civil suits against violators. O.C.G.A. § 16–17–4. In addition, a 50 percent tax is imposed on all loans made in violation of the Act. O.C.G.A. § 16–17–5.

Under the Act, any business entity engaging in payday lending that is not otherwise exempt under the Act is prohibited from obtaining a certificate of authority to do business in the state or will have its existing certificate of authority revoked. O.C.G.A. § 16–17–7. In addition, the site or location where such business is conducted is declared a public nuisance. O.C.G.A. § 16–17–8.

The law provides special protection to members of the U.S. military services and their spouses. Payday lenders are prohibited from garnishing their wages, conducting any collection activity during their deployment to a combat or combat support posting, or contacting their commanding officer in an effort to collect on the loan. O.C.G.A. § 16–17–9(a)(1)–(3). The lender also agrees to be bound by any repayment agreement negotiated through military counselors or third-party credit counselors and to honor any statement or proclamation by a military base commander declaring a specific payday lender branch location to be off limits to military personnel and their spouses. O.C.G.A. § 16–17–9(a)(4)–(5). Payday lenders are also required to disclose these requirements to their military customers. O.C.G.A. § 16–17–9(b).

Finally, the law contains a very broad severability provision. If any provision, or any application of a provision, is found to be invalid or superseded by federal law, "the remaining provisions shall not be affected," and the Act "shall continue to apply to any other person or circumstance." O.C.G.A. § 16–17–10.

## CONCLUSIONS OF LAW

### I. *Standard for Granting a Preliminary Injunction*

■ "A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir.2000).

■■ A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites. 'The burden of persuasion in all of the four requirements is at all times upon the plaintiff.'" *United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir.1983)(quoting *Canal Auth. .v. Callaway,* 489 F.2d 567, 573 (5th Cir. 1974)).

■ Plaintiffs have a particularly heavy burden in this case because they seek to enjoin enforcement of a state statute. "[P]reliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts." *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990).

## II. *Rules of Statutory Construction*

In determining whether plaintiffs have established a substantial likelihood of success on their claims that the Act is unconstitutional, the Court construes the Act using the following accepted rules of statutory construction.

■ First and foremost, the "object in construing penal as well as other statutes, is to ascertain the 'legislative intent." *Hattaway v. United States,* 304 F.2d 5, 8–9 (5th Cir.1962)(quoting *United States v. Hartwell,* 73 U.S. (6 Wall.) 385, 395–96, 18 L.Ed. 830 (1867)). Thus, "the proper course . . . is to search out and follow the true intent of the legislature, and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner, the apparent policy and objects of the legislature." *Id.* at 9–10 (quoting *Johnson v. S. Pac. Co.,* 196 U.S. 1, 18, 25 S.Ct. 158, 49 L.Ed. 363 (1904)).

■ Furthermore, "[i]n the construction of a statute, it is the duty of the court, if possible, to give effect to each of its enactments." *General Motors Acceptance Corp. v. Whisnant,* 387 F.2d 774, 778 (5th Cir.1968)(quoting *Harrison v. Walker,* 1 Ga. 32, 34 (1846)). "[E]very part of a statute must be viewed in connection with the whole, so as to make all its parts harmonize, if practicable, and give a sensible and intelligent effect to each, for it is not to be presumed that the legislature intended any part of a statute to be without meaning." *Id.* (quoting *Drake v. Drewry,* 109 Ga. 399, 35 S.E. 44, 45 (1899)). Thus, "courts should refrain from construing a statutory provision in a way that renders meaningless another provision within the same statute." *United States v. Phipps,* 81 F.3d 1056, 1060 (11th Cir.1996).

■ Finally, it has long been the rule that if a statute is "reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid," it is the duty of the court "to adopt that construction which will save the statute from constitutional infirmity." *United States ex rel. Attorney Gen. v. Delaware & Hudson Co.,* 213 U.S. 366, 407, 29 S.Ct. 527, 53 L.Ed. 836 (1909). Thus, "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided," the court's duty "is to adopt the latter." *Id.* at 408, 29 S.Ct. 527.

## III. *Plaintiffs' Likelihood of Success on the Merits*

Plaintiffs challenge the payday lending law on five grounds. First, they contend that the Act is preempted by Section 27 of the Federal Deposit Insurance Act

(FDIA), 12 U.S.C. § 1831d. Second, they argue that the Act discriminates against interstate commerce and burdens out-of-state competitors in violation of the Commerce Clause. Third, plaintiffs contend that the Act's anti-arbitration provisions are preempted by the Federal Arbitration Act (FAA). Fourth, they argue that the Act's standard for recharacterizing banks' agents as de facto lenders is unconstitutionally vague. Finally, plaintiffs argue that the Act's application to pre-effective date transactions renders it an unconstitutional *ex post facto* law and unconstitutionally impairs the obligations of contracts. For the following reasons, the Court concludes that plaintiffs have failed to establish a substantial likelihood of success on the merits of any of these claims.

### A. FDIA Preemption

In analyzing preemption issues, the Court "start[s] with the assumption that the historic police powers of the states are not superseded by federal law unless preemption is the clear and manifest purpose of Congress." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1122 (11th Cir.2004). Even where Congress has expressly preempted state law, the presumption against preemption "support[s] a narrow interpretation of such an express command." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

In determining the scope of a preemption statute, the Court relies on " 'a fair understanding of congressional purpose' ... [as] discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." *Medtronic*, 518 U.S. at 486, 116 S.Ct. 2240 (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 530 n. 27, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)(opinion of Stevens, J.) and *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111, 112 S.Ct. 2374, 120 L.Ed.2d

73 (1992)(Kennedy, J., concurring in part and concurring in judgment)). "Also relevant ... is the 'structure and purpose of the statute as a whole,' as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* (quoting *Gade*, 505 U.S. at 98, 112 S.Ct. 2374 (opinion of O'Connor, J.)(internal citation omitted)).

Section 27(a) of the FDIA, 12 U.S.C. § 1831d(a), provides in pertinent part that:

In order to prevent discrimination against State-chartered insured depository institutions, ... such State bank ... may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan ... or upon any note ... interest ... at the rate allowed by the laws of the State, territory, or district where the bank is located....

This provision guarantees FDIC-insured state banks the right to "export" their home state interest rates to borrowers in other states. It was added to the FDIA in 1980 to insure state banks parity with national banks, which enjoy the same "exportation" rights under Section 85 of the National Bank Act (NBA). *See* 12 U.S.C. § 85; *Hill v. Chem. Bank*, 799 F.Supp. 948, 951 (D.Minn.1992) ("Congress enacted [§ 1831d] to create parity between national and state banks with respect to usury limitations")(footnote omitted).

Section 27(a) of the FDIA expressly preempts any conflicting state law. *See Cliff*, 363 F.3d at 1122(" 'Express preemption' occurs when Congress has manifested its intent to preempt state law explicitly in the language of the statute"). Plaintiffs contend that the Act is conflicting, and thus preempted, because it would "forbid, or ... impair significantly, the exercise of

a power that Congress explicitly granted." *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 33, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). The Court, however, does not find *Barnett Bank* controlling.

In *Barnett Bank,* the Supreme Court held that a section of the NBA granting national banks the power to sell insurance preempted a Florida law that prohibited them from doing so. The Supreme Court focused in particular on the NBA's use of the word "powers" and the history of that concept in the context of national bank legislation. "That history," the Court noted, "is one of interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Id.* at 32, 116 S.Ct. 1103. After reviewing the cases, the Court concluded: "In defining the scope of statutes and regulations *granting a power to national banks,* these cases take the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Id.* at 33, 116 S.Ct. 1103 (emphasis added).

Unlike the statute at issue in *Barnett Bank,* Section 27(a) of the FDIA is not a statute "granting a power to national banks." Nor, for that matter, does Section 85 of the NBA, the correlative provision to Section 27(a), use the term "powers." The Court concludes that *Barnett Bank*'s "significant impairment" test is not applicable in this case. Instead, the Court will apply ordinary preemption principles.

 Although Section 27(a) of the FDIA contains express preemption language, that language does not directly answer the preemption question. Therefore, the Court looks to the statute's " 'structure and purpose,' or nonspecific statutory language," to determine "preemptive intent." *Barnett Bank,* 517 U.S. at 31, 116 S.Ct. 1103. Under this analysis, preemption

may arise in two ways. First, a federal statute "may create a scheme of federal regulation 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.' " *Id.* (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). This is known as "field preemption" or "occupying the field." *Cliff,* 363 F.3d at 1122. Second, the "federal law may be in 'irreconcilable conflict' with state law." *Barnett,* 517 U.S. at 31, 116 S.Ct. 1103 (quoting *Rice v. Norman Williams Co.,* 458 U.S. 654, 659, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982)). "Conflict preemption," as it is known, "arises in two circumstances: when it is impossible to comply with both federal and state law and when state law stands as an obstacle to achieving the objectives of the federal law." *Cliff,* 363 F.3d at 1122.

In this case, there is no field preemption. Under the FDIA, federally-insured state banks are subject to regulation by both federal and state agencies. *See, e.g.,* 12 U.S.C. §§ 1813(r)(defining "State bank supervisor" as state officer, agency, or other entity with primary regulatory authority over state banks); 1820(h)(1)(A)(granting State bank supervisor regulatory authority over state banks with respect to state laws governing, among other things, fair lending and consumer protection); 1831a(i)(providing that section governing activities of insured state banks "shall not be construed as limiting the authority of ... any State supervisory authority to impose more stringent restrictions"). Thus, it is clear that the FDIA was not intended to "occupy the field" of state bank regulation.

 Turning to the question of conflict preemption, the Court concludes that this is not a case where compliance with both the state and federal laws is impossible. As in *Barnett Bank,* "[t]he two statutes do not impose directly conflicting duties on

[state] banks—as they would, for example, if the federal law said, 'you must [export your home-state interest rate],' while the state law said, 'you may not.'" *Barnett Bank,* 517 U.S. at 31, 116 S.Ct. 1103. Therefore, the preemption question turns on whether the Act "stands as an obstacle to achieving the objectives of the federal law." *Cliff,* 363 F.3d at 1122. As noted above, the objective of Section 27(a) of the FDIA was to put state banks on the same footing as national banks in terms of the right to export their home state interest rates. For the following reasons, the Court concludes that the Act does not stand as an obstacle to achieving this objective and is therefore not preempted.

First, and most important, the Act provides a complete exemption to out-of-state, FDIC-insured banks. O.C.G.A. § 16–17–2(a)(3). Therefore, such banks are free to charge Georgia borrowers their home state interest rates as authorized by Section 27(a) of the FDIA without being subject to liability under the Act.

Plaintiffs argue that the bank exemption is not complete because it is made subject to the Act's de facto lender provisions. *See* O.C.G.A. § 16–17–2(a)(3)(bank exception is "[s]ubject to the provisions of paragraph (4) of subsection (b) of this Code section"). The de facto lender provisions, however, do not deprive the banks of their exemption. Those provisions are themselves made expressly subject to the ex-

ceptions set out in subsection (a), which includes the exception for out-of-state banks. *See* O.C.G.A. § 16–17–2(b). Moreover, the de facto lender provisions expressly recognize the banks' exempt status by referring to arrangements "by which a de facto lender purports to act for an *exempt* entity." O.C.G.A. § 16–17–2(b)(4)(emphasis added). Thus, the de facto lender provisions subject a bank's purported *agent* to liability if the agent receives "a predominant economic interest" in loan revenues and is therefore deemed to be the de facto lender. They do not, under any circumstances, subject the bank itself to liability.[7]

Second, contrary to plaintiffs' argument, the Act does not prohibit out-of-state banks from using agents to make payday loans. The Act clearly permits the use of agents so long as they do not receive "a predominant economic interest" in the loan revenues. Plaintiffs point out that the Act contains no express exemption for agents and argue that the general prohibition on payday lending therefore applies to agents regardless of the amount of their economic interest in the loan revenues. This interpretation of the statute, however, renders the de facto lender provisions mere surplusage. In order to give meaning to these provisions, the law must be construed not to apply to agents that receive less than "a predominant economic interest" in the loan revenues.[8]

---

7. Plaintiffs also contend that banks are subject to prosecution under Section 16–17–2(d), which provides for liability of "[a]ny person who aids or abets ... a violation [of the Act]." This argument, however, ignores the blanket exemption granted to banks under Section 16–17–2(a)(3).

8. Plaintiffs contend that the Act completely prohibits in-state agents of out-of-state banks from lawfully operating in the state regardless of whether they are deemed de facto lenders. Plaintiffs cite Section 16–17–7, which prohibits all entities engaged in "pay-

day lending" from obtaining a certificate of authority to transact business in Georgia, and Section 16–17–8, which declares locations where "payday lending" takes place to be public nuisances. The operative language in both provisions, however, is the term "payday lending," the definition of which "expressly incorporates the exceptions and examples contained in subsections (a) and (b) of Code Section 16–17–2." O.C.G.A. § 16–17–1(a). Thus, these provisions apply to agents only if they are deemed to be de facto lenders under Section 16–17–2(b)(4).

Plaintiffs claim that the use of agents under this limitation is not a "realistic possibility." The Court, however, does not find this conclusory assertion sufficient to overcome the presumption against preemption. On the evidence before the Court, there is no basis to find that agents receiving less than a majority of loan revenues could not still operate profitably. To the contrary, given the extremely low overhead needed to run such operations, which require very little space or equipment and relatively few employees, and the very high dollar volume of loans that the evidence shows these businesses generate,[9] it appears to the Court that agents could operate profitably even though they received less than half of loan revenues.[10] Admittedly, their profits would be less than they are now, but this hardly shows that this type of arrangement would be economically infeasible.[11]

Thus, the law's impact is focused on non-bank entities that receive a predominant share of the revenues from payday loans but, in an effort to avoid Georgia's usury laws, contract with out-of-state banks to play the role of the lender. Other courts have found that enforcement of state laws restricting payday lending against such non-bank entities does not implicate the federal banking laws. For example, in *Goleta Nat'l Bank v. O'Donnell,* 239

F.Supp.2d 745 (S.D.Ohio 2002), Goleta National Bank (Goleta), located in California, sought to enjoin state regulatory action against ACE Cash Express, Inc. (ACE), its purported agent, for making payday loans in Ohio. Goleta argued that the NBA preempted the state's regulatory authority over ACE. The court held that Goleta lacked standing, noting that "there is nothing in the NBA that prevents Ohio from regulating the activities of a lending institution located in Ohio and making loans to Ohio citizens if such loans are in fact made by that lending institution and not by a national bank." *Id.* at 753.

Similarly, in *Goleta Nat'l Bank v. Lingerfelt,* 211 F.Supp.2d 711 (E.D.N.C.2002), Goleta and ACE, once again relying on NBA preemption, sought to enjoin North Carolina officials from enforcing state payday lending laws against ACE. The court refused to interfere in the state enforcement action, finding that NBA preemption would not apply if ACE were found to be the "de facto lender." *Id.* at 717. The court also held that Goleta lacked standing because the enforcement action did not challenge any of its rights under the NBA, and it had therefore not suffered any actual or threatened injury. *Id.* at 719.

In another line of cases, ACE sought to remove state actions brought against it to federal court, arguing that Goleta was the

---

9. For example, the evidence shows that Advance America's 89 payday loan stores in Georgia generate about $2.2 million in gross loan revenues each month.

10. Using the Advance America example, 49% of loan revenues would generate over $1 million per month in gross revenue for Advance America. Plaintiffs argue that agents have historically received the majority of the loan revenues because they bear the majority of the costs, but they have submitted no evidence of what the costs are. Other than conclusory statements in affidavits that the Agents would incur substantial losses if they were to receive less than 50% of loan reve-

nues, there is no evidence that less than a majority of the revenues would not still exceed the costs and thus provide the Agents a profit.

11. In addition, defendants argue that the Act leaves open various other alternatives for out-of-state banks to export their interest rates to Georgia borrowers. These include the use of the mail, the Internet, loan brokers, and registered loan production offices. Plaintiffs contend that none of these alternatives is feasible. However, the evidence in the record does not establish that these are not feasible alternative means for out-of-state banks to exercise their exportation rights.

true lender, and therefore, that the NBA completely preempted the plaintiff's state law claims. In each case, the court held that the NBA did not apply to ACE because it was not a national bank, and that removal was therefore improper.[12] *See State of Colorado ex rel. Salazar v. ACE Cash Express, Inc.,* 188 F.Supp.2d 1282, 1285 (D.Colo.2002); *Brown v. ACE Cash Express, Inc.,* Civil Action No. S–01–2674 (D.Md. Nov. 14, 2001)(unpublished); *Long v. ACE Cash Express, Inc.,* 2001 WL 34106904 at *1 (M.D.Fla. June 18, 2001); *see also Flowers v. EZPawn Oklahoma, Inc.,* 307 F.Supp.2d 1191, 1196 (N.D.Okla. 2004), (remanding case removed on FDIA preemption grounds because complaint was brought against two non-bank entities).

Federal banking regulators have also recognized that non-bank entities which partner with banks in an effort to avoid state usury laws are not entitled to the protection of the federal banking laws. In June 2000, the Chairman of the FDIC expressed concern "about so-called 'charter renting'—that is to say, allowing a lender in another state to use the bank's authority to circumvent state caps on interest rates in exchange for a fee." Remarks of Donna Tanoue, FDIC Chairman (June 13, 2000)(App. to Defs.' Br. in Opp. to Pls.' Mot. for Prelim. Inj., Ex. 14). According to the FDIC Chairman, "[t]his is not what this 'authority' was intended to do." *Id.*

Likewise, in November 2000, the Office of the Comptroller of the Currency (OCC) and the Office of Thrift Supervision (OTS) issued a joint news release, which quoted the Comptroller and the OTS Director as saying that non-bank

> vendors who have targeted national banks and federal thrifts as a means of marketing such products [as payday loans] free from state and local consumer protection laws should not automatically assume that the benefits of the bank or thrift charter will accrue to them by virtue of such relationships, or that OCC or OTS will defend their efforts to avoid state and local laws if challenges are raised.

Joint Release, "Agencies Urge Banks and Thrifts to Evaluate Risks with Vendors Engaged in Practices Viewed as Abusive to Consumers," 2000 WL 1740418 at *2 (Nov. 27, 2000).

In a June 2002 letter, the Chairman of the FDIC echoed their opinion, stating that "non-bank lenders should not assume that the same benefits provided to a bank when it makes a loan will be available to them, particularly with respect to the application of state and local law." Letter from Donald E. Powell, FDIC Chairman, to Jean Ann Fox, Consumer Federation of America (June 19, 2002)(App. to Defs.' Br. in Opp. to Pls.' Mot. for Prelim. Inj., Ex. 21.)

Significantly, federal regulators have relied on the same "predominant economic interest" standard used in the Act to distinguish non-bank lenders from legitimate bank agents. In 2001, in determining that the NBA would preempt a Michigan law that limited national banks' ability to engage in motor vehicle sales financing through automobile dealers, the OCC noted: "This is not a situation where a loan product has been developed by a non-bank

---

**12.** The Court recognizes that these cases involved application of the doctrine of "complete preemption," which "functions as a narrowly drawn means of assessing federal removal jurisdiction," and not "ordinary preemption," which "operates to dismiss state claims on the merits and may be invoked in either federal or state court." *BLAB T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.,* 182 F.3d 851, 854–55 (11th Cir. 1999). The latter type of preemption is at issue here.

vendor that seeks to use a national bank as a delivery vehicle, and where the vendor, rather than the bank, has the *preponderant economic interest* in the loan." Preemption Determination 01–10, 66 Fed.Reg. 28593, 28595 n. 6 (May 23, 2001)(emphasis added).

In a speech the following year, the Comptroller of the Currency criticized attempts by non-bank payday lenders to "rent out" the preemption privileges of a national bank in order to evade state usury laws: "Typically, these arrangements are originated by the payday lender, which attempts to clothe itself with the status of an 'agent' of the national bank. Yet the *predominant economic interest* in the typical arrangement belongs to the payday lender, not the bank." Remarks of John D. Hawke, Jr., Comptroller of the Currency, 2002 WL 31947818 at *6 (Feb. 12, 2002)(emphasis added). The Comptroller concluded that "these arrangements constitute an abuse of the national charter." [13] *Id.*

Plaintiffs cite *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.,* 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978), to support their claim that federal banking laws authorizing exportation of interest rates apply where the bank uses a non-bank agent to make and administer the loans.[14] In *Marquette,* however, the non-bank agent was a *wholly-owned subsidiary* of the national bank, not an independent third-party agent like the Agents in this case. *Id.* at 302, 99

S.Ct. 540. Furthermore, in *Marquette,* the Supreme Court twice cautioned that it was not addressing the question of whether the protections of federal banking laws would apply to non-bank parties extending credit on their own. *Id.* at 307–08, 311 n. 24, 99 S.Ct. 540.

*Krispin v. May Dep't Stores Co.,* 218 F.3d 919 (8th Cir.2000), also cited by plaintiffs, is likewise distinguishable. In *Krispin,* the court held that usury actions brought against a department store by holders of store credit cards implicated the NBA because the store had assigned all its credit card accounts to a wholly-owned national bank subsidiary. In this case, unlike the department store and its national bank subsidiary in *Krispin,* the Banks and their Agents are completely separate and independent entities. Nothing in *Krispin* suggests that application of the Act to the separate and independent non-bank Agents under the circumstances prescribed by the Act's de facto lender provisions implicates the Banks or their rights under the federal banking laws.

Plaintiffs also cite *Cades v. H & R Block, Inc.,* 43 F.3d 869 (4th Cir.), *cert. denied,* 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995), and *Christiansen v. Beneficial Nat'l Bank,* 972 F.Supp. 681 (S.D.Ga.1997). Both cases held that Section 85 of the NBA governed the interest rate a national bank could charge on a tax refund anticipation loan made through an agent to a borrower in another state. Those decisions, however, turned on the

---

**13.** Plaintiffs cite an earlier speech by Comptroller Hawke in which he acknowledged that "existing laws give [national banks] authority to make such [payday] loans." Remarks of John D. Hawke, Jr., Comptroller of the Currency, 2000 WL 573878 at *5 (Dec. 2, 1999). This acknowledgment, of course, is perfectly consistent with his later condemnation of "rent-a-charter" arrangements under which banks essentially "sell" their authority to make payday loans to non-bank lenders.

**14.** Defendants argue that cases permitting agents of national banks to benefit from the National Bank Act's preemption of state laws are not applicable here because, unlike the NBA, the FDIA does not contain a statutory grant of authority to federally-insured, state-chartered banks to originate loans through agents. Because the Court finds these cases distinguishable on other grounds, it does not reach this issue.

courts' rejection of the plaintiffs' contention that the agents' offices constituted "branch" offices of the defendant banks. *Cades,* 43 F.3d at 874; *Christiansen,* 972 F.Supp. at 684. There was no contention that it was the agents, rather than the banks, that had made the loans. Thus, there was no consideration of whether the non-bank agents would have been entitled to NBA protection if they had been the true lenders.[15]

Only one case cited by plaintiffs involved a payday lending arrangement analogous to those at issue here. In *Hudson v. Ace Cash Express, Inc.,* 2002 WL 1205060 (S.D.Ind. May 30, 2002), an Indiana plaintiff sued a California national bank and its purported agent in Indiana alleging that he had obtained a $300 payday loan from one of the agent's Indiana stores at an interest rate that was illegal under Indiana law. The loan documents named the California bank as the lender, but plaintiff argued that the court should regard the agent as the true lender because (1) the agent purchased a 95% participation interest in the loan and was solely responsible for collecting the loan, and (2) the defen-

dants' lending arrangement was designed for the sole purpose of circumventing Indiana usury law.

The *Hudson* court rejected plaintiff's arguments. Relying on *Marquette* and *Krispin,* the court held that the bank was the lender, and that plaintiff's claims were therefore preempted by Section 85 of the NBA. *Hudson,* 2002 WL 1205060 at *4–*6. The Court finds the *Hudson* decision unpersuasive for several reasons.

First, as discussed above, both *Marquette* and *Krispin* are distinguishable from the payday lending arrangement at issue here and in *Hudson.* Thus, on the facts alleged in *Hudson,* those cases did not require a finding that the bank was the true lender or, therefore, that the NBA barred plaintiff's claims.

Second, the *Hudson* court itself recognized that its decision elevated form over substance, noting that plaintiff's "arguments might appeal to those who believe substance should always trump form in law." *Hudson,* 2002 WL 1205060 at *4. Nevertheless, the court concluded that form rather than substance must prevail. This Court respectfully disagrees.[16] This

---

**15.** The Court notes that tax refund anticipation loans like those in *Cades* and *Christiansen* are expressly exempt from the Act. O.C.G.A. § 16–17–2(a)(4).

**16.** The Georgia Court of Appeals also recently rejected the *Hudson* analysis. *BankWest, Inc. v. Oxendine,* 2004 WL 550754 (Ga.App. March 22, 2004). In that case, BankWest and Advance America argued that they were not subject to investigation by Georgia's Industrial Loan Commissioner for making payday loans in violation of the Georgia Industrial Loan Act (GILA) because BankWest was the lender and GILA exempts banks from regulation or examination by the Commissioner. The plaintiffs argued that *Hudson* precluded a determination that Advance America was the real lender. The court rejected this argument on the grounds that *Hudson* relied on a form-over-substance analysis, which was contrary to the rule applied by Georgia courts. *Id.* Viewing the evidence instead from a sub-

stance-over-form perspective, the court found support for the Commissioner's decision to investigate Advance America and its relationship with BankWest. Specifically, the court noted that the terms of BankWest and Advance America's management and services agreement provided for Advance America to receive the majority of interest charged on each loan and to retain almost all of the risk of loss, and for Advance America to indemnify BankWest for claims relating to the loans where BankWest is named and Advance America and not BankWest is found to have violated the law, but not for BankWest to indemnify Advance America for reciprocal claims. The court also noted evidence that Advance America offered loans in its own name in Florida, where payday lending is legal, but that it affiliated with an out-of-state bank in states such as Georgia where payday lending is illegal. *Id.* The court concluded that the Commissioner's investigation was authorized, although it did not reach the issue of

Court finds nothing in the federal banking laws or the cases applying them that gives banks and their purported agents the sole and exclusive right to define the nature of their relationship and their transactions—regardless of whether their characterization comports with reality—for the sole purpose of avoiding the application of state usury laws.[17]

Finally, the *Hudson* court pointed out that Indiana had recently passed a payday lending law that applied, among other things, to "any person who facilitates, enables, or acts as a conduit for any lender who is or may be exempt from licensing under [Indiana law]." *Hudson,* 2002 WL 1205060 at *6 n. 2. The court noted that it was expressing "no view on issues that might arise under this new provision." *Id.*

Plaintiffs also rely on the fact that their loan programs are conducted in accordance with the FDIC's *Guidelines for Payday Lending, available at* http://www.fdic.gov/regulations/safety/payday. These guidelines, however, merely attempt to regulate a practice that is, after all, legal in many states. Nothing in the guidelines suggests that states may not enforce their usury laws against non-bank payday lenders. Indeed, as discussed above, federal regulators have concluded that a bank's authority to export its home-state interest rates will not insulate a non-bank purporting to act as the bank's agent from enforcement of state usury laws if the non-bank receives a predominant economic interest in the loan revenues. *Supra* at 1348–1349.

For all the foregoing reasons, the Court concludes that the Act does not stand as an obstacle to achieving the objective of Section 27(a) of the FDIA of creating parity between national and state banks with respect to usury limitations. Therefore, Section 27(a) of the FDIA does not preempt the Act.[18]

## B. *Commerce Clause*

■ The dormant aspect of the Commerce Clause prohibits the states from engaging in "economic protectionism—that

---

whether the Commissioner had the authority to regulate Advance America or BankWest. *Id.* at *3.

**17.** Plaintiffs argue that the Act constitutes an "unprecedented" attempt by the legislature to alter the legal, contractual relationship between the Banks and their customers. To the contrary, courts and legislatures often ignore the parties' own characterization of a transaction, especially where that characterization is at odds with reality and nothing more than a subterfuge designed to avoid otherwise applicable legal requirements. This is particularly true where usury is concerned. For more than a century, Georgia courts have critically examined the substance of a transaction, rather than the form given to it by the parties, to determine if a contract is usurious: "No disguise of language can avail for covering up usury, or glossing over a usurious contract. The theory that a contract will be usurious or not, according to the kind of paper bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating

it, is altogether erroneous. The law intends that a search for usury shall penetrate to the substance." *Pope v. Marshall,* 78 Ga. 635, 640, 4 S.E. 116 (1887); *see also BankWest, Inc. v. Oxendine,* 2004 WL 550754 (Ga.App. March 22, 2004)(discussed in note 16 *supra* ).

**18.** The Court notes that, as a result of recent enforcement actions, the OCC has halted *all* payday lending activity with third parties by national banks. *See* OCC Annual Report, Fiscal Year 2003, at 17, *available at* http://www.occ.treas.gov/annrpt/annual.htm ("All national banks with known payday lending activities through third-party vendors were ordered in FY 2003 to exit the payday lending business"). It would appear, therefore, that even a complete prohibition on state banks' use of third parties to conduct payday lending would leave state banks on the same footing as national banks with respect to their ability to export interest rates through payday loans. Thus, it is doubtful whether even such a complete prohibition would be preempted by Section 27(a) of the FDIA.

is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Bainbridge v. Turner*, 311 F.3d 1104, 1108 (11th Cir.2002)(quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)). The clause also functions to keep states from venturing excessively into the regulation of interstate commerce and trespassing upon national interests. *Id.*

To determine whether a statutory scheme violates the dormant Commerce Clause, the Court employs a two-tier analysis. First, if the scheme "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," the Court will generally strike down the statute without further inquiry. *Id.* (quoting *Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)). The Court will uphold such a statute only if it is shown to "advance[ ] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* (quoting *Limbach*, 486 U.S. at 278, 108 S.Ct. 1803). However, when "a statute has only indirect effects on interstate commerce and regulates evenhandedly," the Court will "examine[ ] whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.* (quoting *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. 2080).

In this case, plaintiffs contend that the Act fails the first-tier analysis because it discriminates against interstate commerce and favors in-state economic interests over out-of-state interests. Specifi-

cally, plaintiffs argue that the Act violates the Commerce Clause by prohibiting out-of-state banks from using an in-state fiscal agent to market and service small loans to Georgia borrowers, while at the same time exempting favored classes of Georgia-based lenders from all provisions of the Act. Plaintiffs contend that this effectively gives the exempt Georgia-based lenders a monopoly on the making of small loans in the state by eliminating their competition.

This argument is without merit. As discussed above, the Act does not proscribe the use of *all* agents. Instead, it imposes liability only on agents who receive "a predominant economic interest" in the loan revenues. Out-of-state banks are therefore free to use agents who receive less than a predominant economic interest in the loan revenues. Furthermore, the Act does not discriminate in favor of Georgia-based lenders. Indeed, since Georgia-based lenders do not enjoy the blanket exemption that out-of-state banks do, in order for them to avoid liability under the Act, they must conform their activities to one of the other statutory exemptions covering transactions authorized under other Georgia laws. These laws already prohibit payday lending by such Georgia-based lenders, without regard to the level of compensation an agent receives.[19] In that regard, therefore, the Act actually places fewer restrictions on out-of-state banks than it does on Georgia-based lenders.

Plaintiffs also argue that the Act's exemption for transactions under the Georgia Credit Card and Credit Card Bank Act (the Credit Card Act), O.C.G.A. 16–17–2(a)(1)(F), violates the Commerce Clause because the Credit Card Act allows Georgia-based banks—but not out-of-state

---

**19.** The one exception is transactions under the Georgia Credit Card and Credit Card Bank Act, O.C.G.A. § 7–5–1 *et seq.*, which are exempted from the Act under O.C.G.A. § 16– 17–2(a)(1)(F). As discussed below, however, both in-state and out-of-state lenders can take advantage of this exemption.

banks—to make loans at deregulated rates of interest and to use whatever agent assistance they like. This argument is also without merit. Contrary to plaintiffs' contention, the Credit Card Act allows both domestic *and* foreign lenders—including out-of-state banks—to issue credit cards and create credit card accounts in Georgia. *See* O.C.G.A. §§ 7–5–3(providing that "any ... foreign lender ... may organize, own, and control a credit card bank" in Georgia) and 7–5–2(7)(defining "foreign lender" as including "any bank ... organized or chartered under the laws of ... any state other than this state..."). Thus, out-of-state banks can take advantage of the exemption under the Credit Card Act just like Georgia-based lenders.

### C. FAA Preemption

 The FAA embodies a liberal federal policy favoring arbitration agreements and creates a body of federal substantive arbitration law that is binding on both state and federal courts. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Under the FAA, an arbitration provision contained in an agreement evidencing a transaction involving interstate commerce [20] is valid and enforceable "save upon such grounds as exist at law or in equity for the revocation of *any* contract." 9 U.S.C. § 2 (emphasis added). Thus, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Doctor's Assocs., Inc. v.*

*Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). "Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." *Id.* The FAA preempts conflicting state laws that seek to invalidate or restrict the enforcement of arbitration agreements on grounds that are not generally applicable to other types of contracts in the state.

 Plaintiffs argue that the Act conflicts with the FAA because Section 16–17–2(c)(2) creates a special standard of unconscionability that applies only to arbitration clauses in payday loan contracts. The Court disagrees. That Code section simply declares that "[a]n arbitration clause in a payday loan contract shall not be enforceable if the contract is unconscionable." O.C.G.A. § 16–17–2(c)(2). It then directs the court to consider "the circumstances of the transaction as a whole" in determining whether a particular contract is unconscionable. Up to this point, the provision focuses on the contract as a whole and does nothing more than state general principles that are applicable to any contract under Georgia law.

The provision then goes on to specify a non-exclusive list of factors that the court must consider in determining whether a contract is unconscionable. If any of these factors goes beyond the grounds for determining unconscionability that are generally applicable to all contracts in Georgia, then the provision would violate the FAA and would be preempted.[21] Plaintiffs challenge only one of the particular factors listed.

**20.** The Court assumes for purposes of this discussion that plaintiffs' payday loans involve interstate commerce, notwithstanding the Act's provision that "[p]ayday lending involves relatively small loans and does not encompass loans that involve interstate commerce...." O.C.G.A. § 16–17–1(d). This provision expressly relates to the legislature's finding that certain payday lenders were us-

ing forum selection clauses to avoid the Georgia courts, *id.,* a practice that the Act prohibits in a subsection separate from that concerning arbitration clauses. *See* O.C.G.A. § 16–17–2(c)(1).

**21.** Under the Act's severability provision, only the particular factor determined to violate the FAA would be stricken.

Specifically, plaintiffs challenge Section 16–17–2(c)(2)(C), which provides that in determining whether a contract is unconscionable, the court must consider "[w]hether the contract restricts or excludes damages or remedies that would be available to the borrower in court, including the right to participate in a class action." O.C.G.A. § 16–17–2(c)(2)(C). Plaintiffs argue that because there is no general public policy right to participate in a class action under either Georgia or federal law, the Act's inclusion of a waiver of the borrower's right to participate in a class action as an indicator of unconscionability does not reflect Georgia law of general application and is therefore preempted. The Court disagrees.

In general, Georgia law recognizes that a contract's limitation of remedies, when considered in conjunction with other factors, may render the contract unconscionable. *See Mullis v. Speight Seed Farms, Inc.*, 234 Ga.App. 27, 505 S.E.2d 818 (1998). Under the Act, whether the exclusion of a class action remedy in any given case might render a contract unconscionable depends upon the court's consideration of the "totality of the circumstances." The Act does not make all payday lending contracts with class action exclusions unconscionable. It simply directs the court to consider such an exclusion as one factor in determining whether a contract is unconscionable. Without deciding whether any particular application of this provision might be inconsistent with the FAA, the Court does not find that such a direction to the court conflicts with the FAA on its face.[22]

Finally, plaintiffs argue that the Act impermissibly threatens arbiters and arbitration companies with criminal liability for aiding and abetting a person in violating the Act. *See* O.C.G.A. § 16–17–2(d). However, if the Act's provisions banning payday lending are valid, then there is no reason why arbiters and arbitration companies who assist in such violations should be shielded from prosecution. The FAA does not grant arbiters and arbitration companies immunity from liability for violating, or assisting others in violating, otherwise valid state laws.

### D. *Vagueness*

A statute is unconstitutionally vague if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Where, as here, no First Amendment claim is made, "vagueness challenges must be evaluated in light of the facts of the individual case before the court; in other words, the statute is judged on an 'as applied' basis." *United States v. Edgar*, 304 F.3d 1320, 1327 (11th Cir.2002). "[A]n as-applied vagueness challenge 'may be overcome in any specific case where reasonable persons would know that their conduct is at risk.'" *Id.* (quoting *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988)).

Plaintiffs contend that the Act's de facto lender provisions are unconstitu-

---

**22.** Plaintiffs rely on cases holding that "prohibiting class wide arbitration does not render an otherwise valid arbitration clause unconscionable." *Lomax v. Woodmen of the World Life Ins. Soc'y*, 228 F.Supp.2d 1360, 1365 (N.D.Ga.2002); *see also Gilmer v. Interstate Johnson/Lane Corp.*, 500 U.S. 20, 32, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Randolph v. Green Tree Fin. Corp.-Ala.*, 244 F.3d 814, 816–19 (11th Cir.2001). These cases, however, do not preclude consideration of a class action exclusion in conjunction with other relevant factors in determining whether a contract as a whole is unconscionable.

tionally vague. Under those provisions, a purported agent for a national bank or an FDIC-insured state bank is conclusively presumed to be the "de facto lender" on a payday loan "if the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan." O.C.G.A. § 16–17–2(b)(4); *see also* O.C.G.A. § 16–17–6 (purported agent "shall be presumed to be the lender if, under the totality of the circumstances, it holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan").

Plaintiffs complain that the Act fails to provide any guidance or instruction as to the meaning of "predominant economic interest."[23] In support of this argument, plaintiffs pose a number of hypothetical situations under which they claim the meaning of the term is unclear. Plaintiffs, however, cannot establish the vagueness of the law by concocting hypotheticals. They must show that the law cannot be understood by ordinary persons *when applied to the facts of this case.* This they have failed to do.

■ On the facts of this case, the Court finds the term "predominant economic interest" easy to understand and to apply. In addition to the ordinary meaning of the words, the Court is guided by the Act's introductory section, which sets out the legislature's determination that payday lenders often attempt to disguise their loans as being made by banks, "even though the *majority* of the revenues ... are paid to the payday lender." O.C.G.A. § 16–17–1(c)(emphasis added). It then goes on to declare that the use of agency or partnership agreements between in-state agents and out-of-state banks, "whereby the in-state agent holds a predominant economic interest in the revenues generated by payday loans ... is a scheme or contrivance by which the agent seeks to circumvent" Georgia's usury laws. *Id.* The Court concludes that "predominant economic interest" means the "majority" of loan revenues.

In this case, the evidence is undisputed that the plaintiff Agents receive the majority of the loan revenues. In the case of BankWest and Advance America, for example, the borrower pays $17 in interest for every $100 borrowed, and Advance America receives $13.80, or 81%, of that.[24] On these facts, an ordinary person would have no trouble understanding that the Agents have a predominant economic interest in the loan revenues.

Plaintiffs also argue that the Act's authorization to consider "the entire circumstances" and the "totality of the circumstances" in determining whether the agent has a predominant economic interest in loan revenues introduces the possibility that other, unidentified factors in addition to the agent's economic interest may be considered. This argument is without merit. These phrases import nothing more than that the court should take into account all relevant facts and circumstances in determining who receives the majority of loan revenues. This is in keeping with the longstanding principle that Georgia courts will not be bound by the form given to a transaction by the parties but "shall penetrate to the substance."

---

**23.** As discussed above, use of the "predominant economic interest" standard to distinguish non-bank payday lenders from legitimate bank agents originated with the Comptroller of the Currency. *Supra* at 1348–1349.

**24.** Other plaintiffs admit in their verified complaints that the Agents receive "servicing fees representing a predominant economic share of the loan revenues." Community State Bank, et al., Verified Compl. ¶¶ 20 and 23; First Bank of Delaware, et al., Verified Compl. ¶ 18.

*Pope,* 78 Ga. at 640, 4 S.E. 116; *see also Williams v. Powell,* 214 Ga.App. 216, 219, 447 S.E.2d 45 (1994). There is nothing unconstitutionally vague about requiring the courts to consider everything that is relevant in determining whether the law is applicable.

### E. Ex Post Facto Law/Impairment of Contracts

■■■■■ Relying on the absence of any express exception for loans made before the Act's effective date, plaintiffs contend that the Act is an unconstitutional *ex post facto* law insofar as the de facto lender provisions criminalize loans that were legally made before the effective date of the Act.[25] This argument is without merit. Under Georgia law, a statute is presumed to apply only prospectively unless it expressly states otherwise. *Polito v. Holland,* 258 Ga. 54, 55, 365 S.E.2d 273 (1988). The Act contains no express statement calling for retroactive application, so it must be construed to apply prospectively only.[26]

■■■ Plaintiffs also argue that the Act unconstitutionally impairs the existing contractual relationships between the Banks and their borrowers in two ways. First, plaintiffs argue that the de facto lender provisions will negate the contractual relationship between the Banks and their borrowers and make their loans void and uncollectible. Second, plaintiffs contend that by making it impossible for the Agents to continue operating on behalf of the Banks after it takes effect, the Act impairs the Banks' ability to collect loans made prior to the Act's effective date. Both arguments are without merit.

As discussed above, the Act will not impair any existing contractual relationships because it will apply prospectively only. In its prospective application, the Act will not impair any existing contractual relationships because it will effectively *prevent* the formation of a legal contract on behalf of an exempt entity by a de facto lender. Finally, as already discussed, since the Act does not apply to pre-effective date loans and does not preclude all use of agents by out-of-state banks, nothing in the Act prevents the Banks from using their Agents to collect loans made prior to the effective date of the Act.

### IV. Irreparable Harm

■■■ Plaintiffs contend that they will be irreparably harmed if the Act is allowed to go into effect because they will be forced to stop doing business in Georgia, and the Agents will have to close their Georgia stores and lay off all of their employees. As a result, plaintiffs claim, they will lose millions of dollars in loan revenues each month, which will not be recoverable. Defendants argue that plaintiffs can continue doing business in Georgia by simply lowering the interest rates they charge to within the Georgia statutory usury limit of 16%, but plaintiffs respond that this is an economic impossibility.

The Court previously granted plaintiffs' request for a temporary restraining order based in part on a finding that plaintiffs

**25.** An *ex post facto* law is one which punishes as a crime an act that was innocent when done, makes the punishment for a crime more burdensome after its commission, or deprives one charged with a crime of a defense available according to law at the time when the act was committed. *Collins v. Youngblood,* 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990).

**26.** Plaintiffs argue that the Section 16–17–3 declares all payday loan contracts made by a non-exempt lender or deemed to have been made by a "de facto lender" uncollectible and void *ab initio* without regard to the Act's effective date. This argument ignores the fact that Section 16–17–3 applies only to persons who violate Section 16–17–2(a) or (b), and that no such violation is possible until the Act takes effect.

would suffer irreparable harm if the Act were allowed to go into effect. *See* Order of April 30, 2004, at 1. The Court continues to believe that the Act will cause plaintiffs irreparable harm, but only because it is likely to result in a reduction in plaintiffs' revenues that will not be recoverable, not because it will put them out of business.

First, with regard to the Agents, as discussed above, the evidence does not establish that they cannot operate profitably within the confines of the law. However, even assuming that they can restructure their businesses in a manner that will comply with the law and yet continue to be profitable, it is clear that their revenues will be substantially less than before. Under the Eleventh Amendment, these losses will not be recoverable even if the Act is later declared unconstitutional. *See Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1576–77 (11th Cir.1994).

It is not so clear that the Banks will suffer a substantial loss of revenue. As discussed above, under the Act, the Banks may continue to make loans in Georgia without complying with Georgia's usury laws, either using agents who do not receive the majority of loan revenues or other means. Nevertheless, the Act will force the Banks to restructure their manner of doing business in Georgia, which will undoubtedly result in some short term loss of revenue, which will also not be recoverable.

The Court concludes that plaintiffs' threatened loss of revenue, which will not be recoverable, constitutes irreparable harm. *See Bank of America, N.A. v. Sorrell*, 248 F.Supp.2d 1196, 1199–1200 (N.D.Ga.2002).

## V. *Balance of Harms*

Despite the irreparable harm to be suffered by plaintiffs, the Court concludes that the balance of the harms weighs against the granting of injunctive relief. An injunction against enforcement of the Act would permit payday lenders to continue collecting exorbitant amounts of interest from thousands of Georgia citizens who can ill afford it. The Court concludes that the injury to these citizens outweighs any harm plaintiffs might suffer as a result of having to comply with the law.

## VI. *Public Interest*

Plaintiffs contend that their loans are "immensely popular" and provide Georgia borrowers with a source of financing that is often less expensive than available alternatives. They argue that an injunction would serve the public interest by maintaining access for Georgia borrowers to alternative sources of short-term consumer credit, preserving consumer choice, and fostering a competitive market for short-term loans in Georgia.

The Georgia legislature, on the other hand, has declared that "payday lending ... is having an adverse effect upon military personnel, the elderly, the economically disadvantaged, and other citizens of the State of Georgia," and has determined that the severe criminal penalties provided by the Act "are necessary in order to prohibit this activity in the State of Georgia and to cause the cessation of this activity once and for all." O.C.G.A. § 16–17–1(c). The legislature's declared public interest is to be given weight in deciding whether restraining a state statute would harm the public interest. *Premium Tobacco Stores, Inc. v. Fisher*, 51 F.Supp.2d 1099, 1108 (D.Colo.1999).

It is not the province of this Court to resolve the debate as to whether payday lending is good or bad for Georgia citizens. That is a matter for the legislature to decide. Absent a showing by plaintiffs that the Act is unconstitutional, which they have failed to do, the Court must defer to

the legislature's determination that enforcement of the Act will serve the public interest. Accordingly, the Court concludes that consideration of the public interest weighs against the granting of an injunction.

## CONCLUSION

The Court GRANTS plaintiffs' motions for expedited consideration [# 14–1, # 21–1, # 23–1]; GRANTS plaintiffs' motions to exceed page limitations [# 15–1, # 17–1, # 24–1]; and GRANTS non-parties' motions for leave to files briefs *amicus curiae* [# 26–1, # 27–1, # 29–1]. Because the Court concludes that plaintiffs have failed to carry their burden of establishing their entitlement to preliminary injunctive relief, the Court DENIES plaintiffs' motions for a preliminary injunction [# 2–2, # 13–2, # 16–2, # 22–2].